**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

FILED

Mar 7 2018

U.S. COURT OF
FEDERAL CLAIMS

|  |  |
|---|---|
| UTE INDIAN TRIBE OF THE UINTAH AND OURAY INDIAN RESERVATION,<br><br>    Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No. **18-357 L** |

## COMPLAINT

Plaintiff, UTE INDIAN TRIBE OF THE UINTAH AND OURAY INDIAN RESERVATION ("UTE TRIBE" or "TRIBE"), for its Complaint against Defendant, the UNITED STATES, alleges as follows:

## GENERAL NATURE OF THE ACTION

1.      This is an action by the Plaintiff Ute Indian Tribe ("Tribe") against the Defendant United States for the United States' breach of its constitutional, statutory, regulatory, contractual and fiduciary duties to the Tribe, violation of the 1880, 1894 and 1897 Acts, and the unconstitutional Fifth Amendment Taking of some of the "surplus property" (land and natural resources) within the exterior boundaries of the Uncompahgre Reservation.

2.      This action arises out of the United States' mismanagement, wrongful appropriation of revenue, and Fifth Amendment taking of some of the Tribe's surplus property within the Uncompahgre Reservation. These claims stem from the United States' violation of the Acts of Congress that created federal trust ownership for the benefit of the Ute Tribe of the lands

on the Uncompahgre Reservation. The Tribe's losses and damages are due, *inter alia*, to the United States' failures in its exercise of administration, supervision, control, and management of these lands and resources under applicable legal duties—duties that at all times pertinent have been and continue to be under the exclusive custody, control, and prerogative of the United States. The Tribe brings this action to obtain compensation and other relief, including an accounting to assist the Court, for the damage and losses resulting from the claims asserted. Additionally, Plaintiff is entitled to related declarations that Defendant breached its fiduciary trust duties with regard to the management of, and an accounting of Plaintiff's surplus property rights which are the subject of this action; and injunctive relief including an accounting of Plaintiff's surplus property rights.

## **PARTIES**

3.      The Ute Indian Tribe is a federally recognized Indian Tribe, organized with a Constitution approved by the Secretary of the Interior under the Indian Reorganization Act of 1934, 25 U.S.C. § 5123. The Tribe comprises three bands of Ute people, the Uintah Band, the Whiteriver Band, and the Uncompahgre Band. The Tribe occupies the Uintah and Ouray Indian Reservation in the Uintah Basin of northeastern Utah, where the Tribe owns beneficial interests in land and natural resources.

4.      The Uintah and Ouray Reservation was created by, and is the name now applied to the Reservation created by the joinder of two initially separate contiguous reservations which had been created for the bands of the Tribe: the Uintah Valley Reservation and the Uncompahgre Reservation. This suit is solely related to lands within the Uncompahgre portion of the Uintah and Ouray Reservation. Throughout this complaint, the portion of the current Uintah and Ouray

Reservation which started as the Uncompahgre Reservation will be referred to as the Uncompahgre Reservation.

5.     Defendant, the United States, holds legal title to the Tribe's lands and natural resources, including much of the land and resources within the exterior boundaries of the Uncompahgre Reservation, and manages such lands and resources through the Department of the Interior.  Defendant is vested with numerous trust, fiduciary and other legal duties owed to the Tribe under various treaties, executive orders, Congressional acts, judicial decrees, and express and implied contracts.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction under 28 U.S.C. § 1491(a)(1) (Tucker Act) because this is a civil action against the United States arising under the Constitution, laws, treaties and regulations of the United States, or upon express or implied contracts with the United States, including, without limitation, the treaties between the United States and the Uncompahgre Band of the Ute Tribe dated October 7, 1863, 13 Stat. 673, and March 2, 1868, 15 Stat. 619.

7.     Additionally, the Court has jurisdiction over this case pursuant to 28 U.S.C. § 1505 (Indian Tucker Act) which waives sovereign immunity in suits by Indian tribes residing within the territorial limits of the United States arising under the Constitution, laws, treatises or regulations of the United States, and/or is one which would otherwise be cognizable in this Court if the claimant were not an Indian tribe, band, or group.

8.     This action arises under the United States Constitution and various treaties, executive orders, laws, statutes, and regulations of the United States, including without limitation:

        a.     The Treaty of October 7, 1863, 13 Stat. 673;

b.      The Treaty of March 2, 1868, 15 Stat. 619;

c.      Act of April 29, 1874, 18 Stat. 36;

d.      Act of June 15, 1880, 21 Stat. 199;

e.      Exec. Order of Jan. 5, 1882, I Kapp. 901 (2d ed. 1904);

f.      Act of Mar. 3, 1887, 24 Stat. 548;

g.      Act of Aug. 14, 1894, 28 Stat. 286, 337-338;

h.      Act of June 7, 1897, 30 Stat. 62, 87;

i.      Indian Reorganization Act of 1934, Pub. L. 73-383, 48 Stat. 984;

j.      10 Fed. Reg. 12,409 (1945);

k.      Hill Creek Extension Act, 62 Stat. 72 (Mar. 11, 1948).

9.      Venue lies in this Court pursuant to 28 U.S.C. §§ 1505 and 1491(a)(1).

## **FACTUAL BASIS FOR CLAIMS**

### *ESTABLISHMENT OF THE UNCOMPAHGRE RESERVATION*

10.      The Uintah, Whiteriver, and Uncompahgre Bands of the Tribe lived and governed this area well before the United States exercised its authority and before Utah became a state. Since time immemorial, the Bands of the Tribe "ranged from the Wasatch Front all the way to the Colorado Front Range—from present-day Salt Lake City to Denver." CHARLES WILKINSON, FIRE ON THE PLATEAU, CONFLICT AND ENDURANCE IN THE AMERICAN SOUTHWEST, 128 (1999).

11.      On October 3, 1861, President Abraham Lincoln reserved 2,039,040 acres of the land to which the Tribe held "aboriginal title" as an Indian Reservation for what is now the Ute Tribe.  The Reservation, referred to as the Uintah Valley Reservation, was defined as the entire

valley of the Uinta River. Exec. Order of Oct. 3, 1861, I Kapp. 900 (2d ed. 1904). That Reservation is wholly within the present day state of Utah. Its lands are not at issue in this case.

12. The Uncompahgre Band of the Tribe, also known as the Tabeguache (Tabequache) Band of Utah Indians, entered into a treaty with the United States in 1863. In that treaty, it reserved certain lands within Colorado, Utah and New Mexico. Treaty with the Utah Tabeguache (Tabequache) Band, Oct. 7, 1863, 13 Stat. 673, II Kapp 856.

13. In 1868, the United States entered into a treaty with the Bands that would become the current Ute Tribe of the Uintah and Ouray Reservation and other Bands of Ute Indians. Under that treaty, the signing Bands ceded portions of their aboriginal lands to the United States while reserving approximately 15.7 million acres of land. That Reservation, referred to hereinafter as the 1868 Reservation, was wholly within the boundaries of what would become the state of Colorado. It was reserved for the Bands' "undisturbed use and occupation." Treaty with the Ute, Mar. 2, 1868, 15 Stat. 619, II Kapp 990.

14. Some years after the Treaty of 1868, the discovery of large and valuable mineral deposits on the 1868 Reservation prompted the United States to have the Ute Indians to cede 3.7 million acres of the east-central portion of their reservation by entering into the Brunot Agreement of 1874, 18 Stat. 36, I Kapp 151.

15. Mineral discoveries and the continued influx of white squatters within the lands remaining after the 1874 diminishment spurred Congress to force the Ute people to relinquish additional portions of the 1868 Reservation. Following an incident involving the Whiteriver Band, Congress forced the Uncompahgre Band, which is part of the current Ute Tribe, to cede their Colorado Reservation in exchange for Congress directing the Executive Branch to create a

replacement Reservation for them within present-day Utah. Act of June 15, 1880, ch. 223, 21 Stat. 199 ("1880 Act").

16. The 1880 Act provided specific provisions regarding the cession of lands, the acquisition of new lands, and the relocation of the different Bands making up the Confederated Bands of Ute Indians. Because of the critical importance of these provisions, we quote the pertinent sections of the 1880 Act verbatim:

\* \* \* \* \* \*

The \* \* \* chiefs and headmen of the confederated bands of Utes \* \* \* agree and promise to use their best endeavors with their people to procure their consent *to cede to the United States all the territory of the present Ute Reservation in Colorado, except* as hereinafter provided for their settlement.

The Southern Utes agree to remove to and settle upon the unoccupied agricultural lands on the La Plata River, in Colorado: and if there should not be a sufficiency of such lands on the La Plata River and in its vicinity in Colorado, then upon such other un-occupied agricultural lands as may be found on the La Plata River or in its vicinity in New Mexico.

*The Uncompahgre Utes agree to remove to and settle upon agricultural lands on Grand River, near the mouth of the Gunnison River, in Colorado, if a sufficient quantity of agricultural land shall be found there, if not then upon such other unoccupied agricultural lands as may be found in that vicinity in the Territory of Utah.*

The White River Utes agree to remove to and settle upon agricultural lands on the Uintah Reservation in Utah.

\* \* \* \* \* \*

The said chiefs and headmen of the confederated bands of Utes promise to obtain the consent of their people to the cession of the territory of their reservation as above on the following express conditions:

First. That the Government of the United States *cause the lands so set apart to be properly surveyed and to be divided among the said Indians in severalty* \* \* \*.

\* \* \* \* \* \*

Second. That so soon as the consent of the several tribes of the Ute Nation shall have been obtained to the provisions of this agreement, the President of the United States shall cause to be distributed among them in cash the sum of sixty thousand dollars of annuities \* \* \*, and so much more as Congress may appropriate for that purpose; and that *a commission shall be sent to superintend the*

*removal and settlement of the Utes*, and to see that they are well provided with agricultural and pastoral lands sufficient for their future support, and upon such settlement being duly effected, that they are furnished with [other necessities], and that the money to be appropriated by Congress for that purpose shall be apportioned among the different bands of Utes in the following manner: One-third to those who settle on the La Plata River and vicinity [the Southern Utes]; *one-half to those settling on Grand River and vicinity* [*Uncompahgre Utes*], and one-sixth to those settling on the Uintah Reservation [the White River Utes].

Third. That in consideration of the cession of territory to be made by the said confederated bands of the Ute Nation, the United States, in addition to the annuities and sums for provisions and clothing stipulated and [otherwise provided by law or treaty], agrees to set apart and hold, as a perpetual trust for the said Ute Indians, a sum of money, or its equivalent in bonds of the United States, which shall be sufficient to produce the sum of fifty thousand dollars per annum, which sum of fifty thousand dollars shall be distributed per capita to them annually forever.

Fourth. That as soon as the President of the United States may deem it necessary or expedient, the agencies for the *Uncompahgres* and Southern Utes be removed to and established at suitable points, to be hereafter selected, *upon the lands to be set apart,* and to aid in the support of the said Utes until such time as they shall be able to support themselves, and that in the mean time the United States Government will establish and maintain schools in the settlements of the Utes, and make all necessary provision for the education of their children.

Fifth. [Prior treaties are reaffirmed.]

* * * * * *

Sec. 2. [Five Commissioners were authorized to present the agreement to the Utes for their ratification, and upon ratification to assess improvements and take a *census* of the Southern Utes, Uncompahgre Utes, and White River Utes]. * * * [A]nd they [commissioners] shall also select lands and allot them in severalty to said Indians, as herein provided, and superintend the removal, location, and settlement of the Indians thereon, and do and perform such other services as the Secretary of the Interior may consider necessary for them to do in the execution of the provisions of this act.

* * * * * *

Sec. 3. *That the Secretary of the Interior be * * * authorized to cause to be surveyed, under the direction of said commissioners, a sufficient quantity of land in the vicinities named in said agreement, to secure the settlement in severalty of said Indians as therein provided.* And upon the completion of said survey and enumeration herein required, the said commissioners shall cause allotments of lands to be made to each and all of the said Indians, in quantity and character as set forth in the agreement * * * and whenever the report and proceedings of said commissioners * * * are approved by the President * * *, he shall cause patents to issue to each and every allottee for the lands so allotted, with the same conditions, restrictions and limitations mentioned therein as are provided in said agreement; and all the lands not so allotted, the title to which is, by the said agreement of the confederated bands of the Ute Indians, *and this acceptance by the United States, released and conveyed to the United States, shall be held and deemed to be public lands of the*

*United States and subject to disposal under the laws providing for the disposal of the public lands*, at the same price and on the same terms as other lands of like character, except as provided in this act: *Provided, That none of said lands, whether mineral or otherwise, shall be liable to entry and settlement under the provisions of the homestead law; but shall be subject to cash entry only in accordance with existing law; and when sold the proceeds of said sale shall be first sacredly applied to reimbursing the United States for all sums paid out or set apart under this act by the government for the benefit of said Indians, and then to be applied in payment for the lands at*[*$1.25*] *per acre which may be ceded to them by the United States outside of their reservation, in pursuance of this agreement. And the remainder, if any, shall be deposited in the Treasury as now provided by law for the benefit of the said Indians, in the proportion hereinbefore stated, and the interest thereon shall be distributed annually to them in the same manner as the funds provided in this act: * * *.*

(Emphasis supplied throughout, except usual statutory italics.)

* * * * * *

17.     Pursuant to the 1880 Act, the Uncompahgre Utes, later known as the Uncompahgre Band, agreed to cede its interest in the remaining lands of the 1868 Reservation in Colorado in exchange for the right "*to remove to and settle upon agricultural lands on Grand River, near the mouth of the Gunnison River, in Colorado, if a sufficient quantity of agricultural land shall be found there, if not then upon such other unoccupied agricultural lands as may be found in that vicinity in the Territory of Utah.*"  1880 Act, ch. 223, 21 Stat. 199, 200 (emphasis added).

18.     The Commission created by the Executive Branch to carry out the congressional directive to relocate the Uncompahgre Band determined that the lands "near the mouth of the Gunnison River lacked sufficient agricultural land for the Uncompahgre Band's relocation.  *Ute Indian Tribe v. Utah* ("*Ute III*"), 773 F.2d 1087, 1097 (10th Cir. 1985) (en banc) (summarizing original source materials).

19.     The Commission instead found land in northeastern Utah.  The Commission, did, however, express concern that the land it had identified did not meet the statutory requirements defined by Congress.

The Commission is of the opinion that it would be advisable to reduce, by one-half, the amount of agricultural land assigned to each Ute Indian by the terms of the agreement, and act of Congress of June 15, 1880, and to increase the quantity of grazing land or to render them some other equitable equivalent therefor.

U.S. DEP'T OF THE INTERIOR, ANNUAL REPORT OF THE COMM'R OF INDIAN AFFAIRS TO THE SEC'Y OF THE INTERIOR FOR THE YEAR 1881, 325 (1881).

20.     Nevertheless, the Uncompahgre Band was forcibly removed from their homeland in Colorado to this land in Utah of dubious agricultural sufficiency.

21.     Congress required, through the 1880 Act, that the replacement Reservation was initially to be set aside as an Indian Reservation.  For example, the 1880 Act directed that "the Government of the United States cause the lands *so set apart* to be properly surveyed and to be divided among the said Indians in severalty."  21 Stat. at 200-201 (emphasis added).  The Act again emphasized that lands were to be set apart, stating that the agencies for the Uncompahgres and Southern Utes were "to be removed to and established at suitable points, to be hereafter selected, *upon the lands to be set apart*."  *Id*. at 201 (emphasis added).  Further, the Act stated that "the United States Government will establish and maintain schools *in the settlements of the Utes*."  *Id*. (emphasis added).

22.     Further enforcing the necessity of having land set aside, the 1880 Act provided that the Uncompahgre Band would not be subject to the laws of the applicable State or Territory until "the *completion of said allotments and patenting* of the lands to said allottees."  *Id*. at 204 (emphasis added).

23.     The Commission recognized the importance of Congress's directive that lands be set aside for the Uncompahgre Band while allotments were determined.

> Until the Indians can be made somewhat familiar with their new relations, it is . . . of vital importance to maintain the exterior boundary limits of the lands upon which they dwell as a reservation, and within which white men may not be allowed to locate. *This protection may be secured by legislation or possibly by executive order.* For years to come these Indians should certainly have the aid of the government in protecting them from collision with white men.

U.S. DEP'T OF THE INTERIOR, ANNUAL REPORT OF THE COMM'R OF INDIAN AFFAIRS TO THE SEC'Y OF THE INTERIOR FOR THE YEAR 1881, 325 (1881).

24.     On January 5, 1882, pursuant to the 1880 Act, and as recommended by the Commissioner of Indian Affairs, President Chester Arthur signed an Executive Order that "set apart as a reservation for the Uncompahgre Utes" approximately 1,900,000 acres for the Uncompahgre Band in this area of northeastern Utah, commonly referred to as the Uncompahgre Reservation. Exec. Order of Jan. 5, 1882, I Kapp 901.

25.     Over more than a decade, the Uncompahgre Band occupied and utilized the Uncompahgre Reservation, and the United States treated the reservation like all other reservations.

26.     For example, the Commissioner of Indian Affairs found that, under the Indian Leasing Act of 1891, ch. 383, 26 Stat. 794, I Kapp 56, 57, the Uncompahgre Band held compensable title to their lands, and could lease their lands for mining purposes. *Ute Indian Tribe v. Utah* ("*Ute I*"), 521 F. Supp., 1072, 1101 (D. Utah 1981) (citing Letter from Comm'r of Indian Affairs to Sec'y of the Interior of Dec. 30, 1892).

## *ALLOTMENT AND OPENING OF THE UNCOMPAHGRE RESERVATION*

27.     Eventually, however, the United States continued to press its now discredited policy of allotment on the Uncompahgre Reservation. To attempt to overcome the Uncompahgre Band's resistance to allotment, Congress passed two additional acts attempting to force allotment on the Ute Tribe and extending the deadline for allotment.

28.　　Congress attempted to have the Uncompahgre Reservation allotted under the Act of August 14, 1894, ch. 290, 28 Stat. 286, 337-338 ("1894 Act").  The 1894 Act provided that, following approval of allotments by the Secretary, the "remainder of the lands on said reservation" would be "immediately open to entry under the homestead and mineral laws."  Act of Aug. 15, 1894, ch. 290, §21, 28 Stat. 337.  However, the 1894 Act required conditions precedent and qualified the restoration of lands to the public domain and entry.

29.　　The Executive Branch appointed a three-person commission to attempt to carry out allotment under the 1894 Act.  Letter from Assistant Attorney General to Secretary of the Interior (Aug. 5, 1897).  Ultimately, the terms of the 1894 Act were never carried out due to opposition from the Uncompahgre Band.  *Id.*  The Commission was disbanded before any lands were allotted or any proclamation was issued.  *Id.  See also Ute I*, 521 F. Supp, 1072, 1103 (D. Utah 1981) (summarizing relevant history).

30.　　As pressure to open the Uncompahgre Reservation to non-Indian settlement continued, Congress passed another allotment act, the Act of June 7, 1897, ch. 3, 30 Stat. 62, 87 ("1897 Act").  In contrast to the 1894 Act, the 1897 Act provided a deadline, April 1, 1898, upon which the Reservation would be "open for location and entry under all the land laws of the United States."  Act of June 7, 1897, ch. 3, 30 Stat. 62, 87.

31.　　The Uncompahgre Commission failed to make any allotment by the April 1, 1898 deadline.  Western Union Telegram from Agent H.P. Myton, Uncompahgre Allotment Commissioner, to Commissioner of Indian Affairs (March 27, 1898); Report of the Comm'r of Indian Affairs at 42 (1898), *reprinted in* H.R. Doc. No. 5 (1899).

32.     By separate legislation, Congress ultimately confirmed 83 allotments to Uncompahgre Band members, totaling approximately 12,500 acres, within the Uncompahgre Reservation.  Act of Mar. 1, 1899, ch. 324, 30 Stat. 924, 940-41, I Kapp 686.

33.     The allotment provisions of the 1880, 1894, and 1897 Acts were intended to be read together.  INDIAN LANDS—ALLOTMENT—UNCOMPAHGRE UTES, DECISIONS OF THE DEP'T OF THE INTERIOR AND GENERAL LAND OFFICE IN CASES RELATING TO THE PUBLIC LANDS, 97 (Aug. 5, 1897); Letter from Willis Van Devanter, Assistant Attorney-General to Cornelius N. Bliss, Sec'y of the Interior (Aug. 5, 1897).

34.     The 1880 Act plainly provided that lands not allotted would be opened for disposal "at the same price and on the same terms as other lands of like character."  1880 Act, ch. 223, § 3, 21 Stat. 199, 203 (June 15, 1880).  That Act further provided that the remaining proceeds from the land sales "<u>shall</u> be deposited in the Treasury as now provided by law for the benefit of the said Indians."  *Id.* at 204 (emphasis added).

35.     Despite the language of the 1880, 1894, and 1897 Acts, the United States did not pay the Uncompahgre Band or the Ute Tribe for the unallotted surplus lands of the Uncompahgre Reservation that were disposed of after 1897 and did not deposit proceeds from the land into an account for the Tribe.

*UNCOMPAHGRE RESERVATION AFTER ALLOTMENT AND OPENING*

36.     Initially, there was very little non-Indian activity within the Reservation.  By the late 1920s, however, the Ute Tribe's growing livestock industry was threatened by the influx of non-Indian stockmen from Colorado and other parts of Utah.  DEP'T OF THE INTERIOR, OFFICE OF

INDIAN AFFAIRS, STATEMENT CONCERNING THE UNCOMPAHGRE GRAZING RESERVE, 3 (Feb. 6, 1943).

37.     On September 26, 1933, the Secretary of the Interior temporarily withdrew "the area embraced in the Executive Order of January 5, 1882, as a grazing reserve, in aid of legislation to make the withdrawal permanent."  DEP'T OF THE INTERIOR, OFFICE OF THE SECRETARY, TEMP. WITHDRAWAL OF VACANT AND UNENTERED LANDS WITHIN THE AREA EMBRACED IN EXECUTIVE ORDER OF JANUARY 5, 1882, 2 (Sept. 26, 1933) ("1933 Withdrawal").

38.     The 1933 Withdrawal was based upon the United States' continued recognition that the land was still an Indian Reservation.  The 1933 Withdrawal expressly cited authority delegated in Section 4 of the Act of March 3, 1927, 44 Stat. 1347 ("1927 Act").  The 1927 Act allowed withdrawals within the "unallotted lands within the limits of any reservation … created by Executive order for Indian purposes."  Act of March 3, 1927, 44 Stat. 1347.

39.     The 1927 Act expressly recognized that, "changes in the boundaries of reservations created by Executive order . . . for the use and occupation of Indians shall not be made except by Act of Congress..." and that "the proceeds from rentals, royalties, or bonuses … upon lands within Executive order Indian reservations … shall be deposited in the Treasury of the United States to the credit of the tribe of Indians for whose benefit the reservation … was created…."  Act of March 3, 1927, 44 Stat. 1347 (emphasis added).

40.     The Secretary's use of the 1927 Act indicated that he understood that the Uncompahgre Reservation still existed for the benefit of the Uncompahgre Band, and his reliance on Section 4 to make a temporary withdrawal "in aid of legislation" indicated that he understood that any change in that recognized status would have required a subsequent act of Congress.

41.     The Secretary's 1933 Withdrawal provided that the Uncompahgre Reservation lands would be managed "under approved permits from the Commissioner of Indian Affairs." 1933 Withdrawal at 2.

42.     By agreement between federal agencies within the Department of Interior, approved by the Secretary of the Interior, the Uncompahgre Reservation lands were placed under a complicated joint management regime of two agencies.  Letter from John Collier, Comm'r of Indian Affairs and John Deeds, Division of Grazing Control, to the Sec'y of the Interior (July 19, 1935) ("1935 Agreement").

43.     Under the 1935 Agreement the Secretary approved placing the entire Uncompahgre Grazing Reserve under the administration of the newly enacted Taylor Grazing Act for the next year and a half or until Congress passed a bill creating a "new" Uncompahgre Reservation and subject to provisions recognizing the Uncompahgre Band's ongoing beneficial interest in the withdrawn lands.

44.     Under the 1935 Agreement, non-Indians were required to pay grazing fees and would receive only "temporary grazing licenses which do not create in the licensees vested rights of any kind in and to these lands" and that "the right, title and interest of the Indians in and to the [so-called] ceded Uncompahgre lands shall in no way be jeopardized."  1935 Agreement at 2.  In addition, under the 1927 Act providing the authority for the withdrawal, "proceeds from rentals, royalties, or bonuses" were required by law to be "deposited in the Treasury of the United States to the credit of" the Uncompahgre Band.  Act of March 3, 1927, 44 Stat. 1347.

45.     Furthermore, during this time, while non-Indians had to pay grazing fees, grazing fees for the Uncompahgre Band were waived and nonuse was protected given their ongoing beneficial interest in the lands.

46.     The 1935 Agreement required that the Commissioner of Indian Affairs "concur in all matters . . . relative to the administration under the Taylor Grazing [Act]."  1935 Agreement at 1.

47.     On November 25, 1936, with no bills in sight that would create a "new" Uncompahgre Reservation, the Secretary approved the extension of the 1935 Agreement "until final action by Congress."  Mem. from Comm'r of Indian Affairs to Secretary of the Interior (Nov. 25, 1936).  As before, this extension of the 1935 Agreement recognized that "grazing fees for Indians are to be waived."  *Id*.

48.     Despite the 1935 Agreement's requirements for concurrence by the Commissioner of Indian Affairs and recognition of the Uncompahgre Band's ongoing interests, the Division of Grazing Control's management of the reserve threatened the Uncompahgre Band's stock. Between 1935 and the early 1940's the Office of Indian Affairs acted time and time again to seek enforcement of the 1935 Agreement and protect the rights of the Uncompahgre Band.

49.     The Commissioner also suggested that if the Grazing Service (formerly the Division of Grazing Control until August 26, 1939) could not comply with the requirements of the 1935 Agreement that the Agreement be cancelled "to place the lands under administration of the Indian Service."  Mem. from Comm'r of Indian Affairs to Director of Grazing Service at 3 (Feb. 6, 1940).

50.     On February 15, 1940, the Commissioner of Indian Affairs and the Director of Grazing Service attempted to resolve these management issues by issuing "Joint Instructions to the Field Personnel."  U.S. Dep't. of Interior, *Joint Instructions to the Field Personnel, Office of Indian Affairs and the Grazing Service, Dep't. of the Interior, Utah* (dated Feb. 15, 1940) ("Joint Instructions").  These Joint Instructions set out to eliminate "overstocking," nonuse licenses issued by the Office of Indian Affairs would be protected and the Grazing Service would not issue competing licenses for grazing privileges, grazing fees would not be collected from the Indians, and the Office of Indian Affairs and Grazing Service were to work closely in the joint management of these lands.  Joint Instructions at 2.

51.     Despite the Joint Instructions, attempts by non-Indian stockmen to utilize and overgraze the Uncompahgre Reservation lands continued.  Mem. from Asst. to Comm'r of Indian Affairs Walter Woehlke to Asst. Comm'r of Indian Affairs William Zimmerman, Jr. (Aug. 27, 1942); Mem. from Supt. Uintah & Ouray Agency to Comm'r of Indian Affairs (Sept. 1, 1942); Mem. from Asst. to Comm'r of Indian Affairs Walter Woehlke to Supt. Uintah & Ouray Agency *(*Sept. 15, 1942).

52.     In 1948, Congress passed legislation to extend the boundaries of the Uintah and Ouray Reservation by adding an area now known as the Hill Creek Extension. Act of March 11, 1948, 62 Stat. 72 ("1948 Act"); *Hearing before the Subcomm. on Indian Affairs of the Comm. on Public Lands*, 80th Cong. 1 (1947).

53.     Section 2 of the 1948 Act directed the Secretary to revoke the 1933 Order that had withdrawn the Uncompahgre Grazing Reserve.  Act of March 11, 1948, 62 Stat. 72.

54.     The Bureau of Land Management ("BLM"), previously the U.S. Grazing Service, moved quickly to gain control of the remaining lands of the Uncompahgre Reservation. Revocation of Departmental Order of Sept. 26, 1933, as modified, 13 Fed. Reg. 4,105 (July 17, 1948). In a July 1948 Order drafted by the BLM, the Secretary directed that the remaining lands "shall be administered for grazing purposes under applicable laws." *Id.*

55.     The BLM has managed these lands since 1948, leasing these lands for grazing and oil and gas purposes. For example, on December 12, 2017, the BLM conducted an oil and gas lease sale in the Green River District for 75 parcels of land, 34 of which are located within the exterior boundaries of the Uncompahgre Reservation. The BLM proceeded with the sale even after receiving the Tribe's protest regarding the leasing of those 34 parcels. *Decision on Protest to the Inclusion of Thirty-Four Parcels in the December 2017 Competitive Oil and Gas Lease Sale* (Jan. 5, 2018).

56.     The Uncompahgre Band has never received any payment from the United States for the BLM's leasing and other utilization of these lands from 1933 to the present.

57.     Upon information and belief, the BLM has received and continues to receive on a daily basis money from leases of minerals and grazing from the Uncompahgre Reservation. Because the proceeds from the sale of the surplus lands were to be held in trust for the Tribe under the 1880, 1894 and 1897 Acts, those revenues, hundreds of millions of dollars, should be held in trust for the Ute Tribe.

58.     The United States wrongly has hundreds of millions of dollars that, under the applicable acts of Congress and the history discussed herein belong to the Ute Indian Tribe.

*THE UNCOMPAHGRE RESERVATION TODAY*

59.     The majority of land within the exterior boundaries of the Uncompahgre Reservation is still managed by the BLM.  270,820 acres of land within the exterior boundaries of the Uncompahgre Reservation was restored to trust status through the Hill Creek Extension Act. S. Rep. No. 1372, at 6 (1948).  Some land from the 83 allotments remains in trust status. Additionally, the State of Utah owns a sizable amount of land as State of Utah School and Institutional Trust Lands Administration ("SITLA").  STATE OF UTAH SCHOOL AND INSTITUTIONAL TRUST LANDS ADMINISTRATION, DIGITAL PLAT MAPS, http://platmap.trustlands.utah.gov/ (last visited Jan. 19, 2018).  Finally, there is some privately-held, fee land within the exterior boundaries of the Uncompahgre Reservation.

60.     Utah has continued to accumulate SITLA lands within the exterior boundaries of the Uncompahgre Reservation through land exchanges with the United States.  For example, in 2014, the Secretary, BLM, and SITLA completed a land exchange under the authority of the Utah Recreational Land Exchange Act, Pub. L. No. 111-53 (2009).  Decision Record (2014).  Through this exchange, SITLA received thousands of acres of land within the Uncompahgre Reservation. Exchange Agreement Utah Recreational Land Exchange Act of 2009 UTU-87577FD/PT (2011). This exchange was completed without the consent of the Tribe and without any compensation to the Tribe even though this land was undisposed-of surplus land, held in trust by the United States for the benefit of the Tribe.

61.     The SITLA lands are not at issue in this case, although federal compensation to the Ute Tribe for proceeds or value which the United States received from those lands is at issue.

62.     The Uncompahgre Reservation is Indian Country.  *Ute III*, 773 F.2d 1087 (10th Cir. 1985) (en banc).  The Tenth Circuit Court of Appeals has repeatedly affirmed in the *Ute v. Utah* series of cases that the 1897 Act neither disestablished nor diminished the Reservation, and no subsequent event or act did so either.  *Ute III*, 773 F.2d at 1099; *Ute Indian Tribe v. Utah*, 114 F.3d 1513 (10th Cir. 1997)  ("*Ute V*"); *Ute Indian Tribe v. Utah*, 790 F.3d 1000 (10th Cir. 2015) ("*Ute VI*").

63.     In *Ute III*, the Tenth Circuit court reviewed the 1894 and 1897 Acts that, read together, provided for the opening of the Reservation.  *Ute III*, 773 F.2d at 1092.  The court found that the legislative history and the statutory language of the 1894 and 1897 Acts "indicates that there is no explicit language of cession, termination, or any other reference to 'the present and total surrender of all tribal interests.'"  *Id*.  Additionally the court did not find "any language which promises the Indians any certain sum for their lands."  *Id*.  The court thus concluded that the 1897 Act "merely opened lands to public entry and *failed to extinguish the Reservation*."  *Id*.

64.     Because the Uncompahgre Reservation boundaries were never diminished or disestablished, the Reservation remains Indian Country.  *Id*.  Federal agencies continue to treat the land as Indian Country.  The United States regularly prosecutes criminals under laws applicable to Indian Country, and in each such case it avers and then carries its burden to prove beyond a reasonable doubt that that the Uncompahgre Reservation is Indian Country.  The United States Environmental Protection Agency, Fish and Wildlife Service and other agencies within the Department of the Interior recognize that the Uncompahgre Reservation is Indian Country.  E.g. Draft Federal Implementation Plan for Existing Oil and Natural Gas Sources; Uintah and Ouray Indian Reservation in Utah, 29.

## FIRST CLAIM FOR RELIEF
### (Breach of Trust and Fiduciary Duties)

65.     Plaintiff fully incorporates the foregoing paragraphs and allegations of the Complaint as though set forth fully herein.

66.     The Defendant exercised (and continues to exercise) broad authority and control over the Tribe's surplus lands following the opening of the Uncompahgre Reservation pursuant to the 1880, 1894 and 1897 Acts.

67.     Under the 1880, 1894 and 1897 Acts, all money received by the United States from sale or leasing of land or natural resources from the land on the Uncompahgre Reservation were and are to be deposited in trust for the Ute Tribe.

68.     Additionally or in the alternative, under the 1927 Act and 1933 withdrawal, all money received by the United States from sale or leasing of land or natural resources from the land on the Uncompahgre Reservation were to be deposited in trust for the Ute Tribe.

69.     Plaintiff retains a beneficial interest in all of the undisposed-of lands and natural resources contained within the boundaries of the Uncompahgre Reservation.  Defendant owed Plaintiff a fiduciary duty to appropriately manage Plaintiff's lands and natural resources located within the boundaries of the Uncompahgre Reservation.  Defendant's acts and omissions, described herein, breached that duty.

70.     The Defendant is subject to numerous trust and fiduciary duties and obligations to the Ute Indian Tribe including, without limitation, the duties and obligations described in Paragraphs 15-30 of this Complaint.  The Defendant repeatedly breached its trust and fiduciary obligations to the Tribe by: failing to deposit proceeds from the sale of the surplus lands that were opened for "cash entry" following allotment pursuant to the 1880, 1894 and 1897 Acts in a tribal

trust account; failure to deposit compensation for any land exchanged, or sold within the boundaries of the Uncompahgre Reservation in a tribal trust account; and failing to deposit proceeds from grazing and mineral leases or mineral royalties into a tribal trust account.

71.    Plaintiff is entitled to monetary damages for Defendant's breach of trust in complying with the 1880, 1894 and 1897 Acts.  To wit, the Defendant breached its fiduciary duty to comply with the money mandating provisions of the 1880 and 1897 Acts by not putting the proceeds from the surplus Uncompahgre Reservation lands into an account for the Ute Tribe, as required by those acts.

72.    Defendant knew or should have known that its transactions, acts, and omissions were in violation of federal statutes and were also in breach of its fiduciary duty, yet failed to advise Plaintiff of same.  Plaintiff was denied essential information necessary to be aware of the wrongs committed by Defendant.  Plaintiff has been unable to discover its injuries because this information is peculiarly within the knowledge of Defendant, its fiduciary.  A claim does not accrue until all events necessary to fix the liability of a defendant have occurred.  *Martinez v. United States*, 333 F.3d 1295, 1303 (Fed. Cir. 2003, *en banc*) (A claim arises under the Tucker Act only "when all events have occurred to fix the Government's alleged liability…"); *Fort Mojave Indian Tribe v. United States¸* 23 Cl. Ct. 417 (1991).  To this day, Plaintiff's rights to the land and the natural resources within the Uncompahgre Reservation following allotment have never been fixed, quantified or resolved.

73.    Accordingly, the wrongs committed by Defendant as trustee in the mismanagement of Plaintiff's lands and natural resources have been inherently unknowable to Plaintiff.  They were never apparent from any decree or treaty, and to this day remain unaddressed.  Given the fiduciary

nature of the relationship, "beneficiaries of [a] trust are permitted to rely on the good faith and expertise of their trustees," and therefore beneficiaries, such as Plaintiff, "are under a lesser duty to discover malfeasance relating to their trust assets." *Shoshone v. United States,* 364 F.3d 1339, 1347-48 (Fed. Cir. 2004). Limitations do not begin to run until an appropriate accounting is provided, even where plaintiff has actual knowledge of the loss or mismanagement. *Osage Tribe Indians of Oklahoma v. United States*, 68 Fed. Cl. 322, 334 (2005).

74. Defendant owes a continuing duty including under the 1880, 1894 and 1897 Acts to appropriately manage Plaintiff's land and natural resources within the exterior boundaries of the Uncompahgre Reservation. *See generally, Friedman v. United States,* 159 Ct. Cl. 1, 310 F.2d 381, 385 (Ct. Cl. 1962), *cert. denied,* 373 U.S. 932 (1963); *Acker v. United States*, 23 Cl. Ct. 803 (1991). Defendant continues to breach that duty on an annual if not daily basis, including the years immediately prior to the filing of this lawsuit. *Id.* (as to timber, "the existence of a continuing duty to regenerate means that on each day [defendant] failed in its duty to regenerate a given stand, there arose a new cause of action."). The continuing duty to replant in *Mitchell* is exactly the type of continuing duty expressly contemplated by the 1880, 1894 and 1897 Acts, to appropriately manage a tribe's land and natural resources.

75. Upon information and belief, Plaintiff's oil and gas resources generate significant annual revenue for Defendant. Defendant has failed to make any related payments to Plaintiff. Each failure to appropriately recognize and pay revenues gives rise to a separate cause of action. *Friedman v. United States*, 310 F.2d 381, 384-85 (1962) (where payments are to be made periodically, each successive failure to pay gives rise to a new cause of action). The same is true

as to Defendant's failure to preserve Plaintiff's rights to the land and natural resources located within the exterior boundaries of the Uncompahgre Reservation.

76.     Due to the manner in which Defendant continuously takes from Plaintiff's natural resources within the exterior boundaries of the Uncompahgre Reservation and fail to deposit the proceeds into the Tribe's account, and due to the continuous acts and omissions described hereinabove, occurring annually if not daily, Plaintiff's claim here is "inherently susceptible to being broken down into a series of independent and distinct events or wrongs, each having its own associated damages." *Rosebud Sioux Tribe v. United States,* 75 Fed. Cl. 15, 26 (2007).

**SECOND CLAIM FOR RELIEF**
**(Violation of 1880, 1894 and 1897 Acts)**

77.     Plaintiff fully incorporates the foregoing paragraphs and allegations of the Complaint as though set forth fully herein.

78.     Under the 1880, 1894 and 1897 Acts, all money received by the United States from sale or leasing of land or natural resources from the land on the Uncompahgre Reservation were and are to be deposited in trust for the Ute Tribe.

79.     Additionally or in the alternative, under the 1927 Act and 1933 withdrawal, all money received by the United States from sale or leasing of land or natural resources from the land on the Uncompahgre Reservation were to be deposited in trust for the Ute Tribe.

80.     The Defendant repeatedly violated the 1880, 1894, and 1897 Acts by: failing to deposit proceeds from the sale of the surplus lands that were opened for "cash entry" following allotment pursuant to the 1880, 1894 and 1897 Acts in a tribal trust account; failure to deposit compensation in a tribal trust account for any surplus land exchanged within the boundaries of the

Uncompahgre Reservation; and failure to deposit proceeds from grazing and mineral leases or mineral royalties into a tribal trust account.

81.     Instead of depositing these proceeds in a tribal trust account, the Defendant wrongfully appropriated these proceeds for itself or failed to collect proceeds due. Defendant's acts and omissions identified hereinabove benefitted Defendant, and proximately caused Plaintiff's injuries, thereby entitling Plaintiff to recover direct damages, *inter alia,* specific compensation for the value of the proceeds described in Paragraph 80 which Defendant received or should have received.

## THIRD CLAIM FOR RELIEF
### (Unconstitutional Taking Under the 5th Amendment)

82.     Plaintiff fully incorporates the foregoing paragraphs and allegations of the Complaint as though set forth fully herein.

83.     Under federal law, tribal property held in trust by Defendant is inalienable except as authorized by Congress. Even then, Defendant cannot take Plaintiff's property in violation of Plaintiff's Fifth Amendment rights. *United States v. Sioux Nation of Indians,* 448 U.S. 371, 408 (1980). There has been no Congressional authorization for the taking of Plaintiff's land and/or natural resources from that land and/or proceeds from those lands in violation of Plaintiff's rights. Tribal property can be held subject to the limited authority of the United States to take them for such objects as are germane to the execution of the powers granted to it; provided that they are not taken without just compensation being made to the owner. Plaintiff is entitled to reasonable, certain and adequate provisions for obtaining compensation. *United States v. Creek Nation,* 295 U.S. 103 (1935) (Defendant may not appropriate lands held by Indian nations without paying

compensation); *United States v. Shoshone Tribe*, 304 U.S. 111, 116 (1938) (Defendant does not have the power to give natural resources to others, or appropriate them to itself, without paying compensation); *Menominee Tribe v. United States*, 59 F. Supp. 137 (Ct. Cl. 1945). The reference in the Takings Clause to "just compensation" is an explicit money-mandating provision. *E.g., Jan's Helicopter Serv., Inc. v. F.A.A.,* 525 F.3d 1299, 1309 (Fed. Cir. 2008).

*84.* As in *Shoshone Tribe,* Defendant has, and continues to sell, lease, exchange, take, or otherwise dispose-of Plaintiff's surplus property and/or proceeds from that property. Defendant's control over the surplus Uncompahgre Reservation lands does not extend so far as to enable Defendant to convey this property to others, or to appropriate Tribal property or proceeds for its own purposes, without rendering, or assuming an obligation to render, just compensation. *Klamath & Modoc Tribes v. United States*, 193 Ct. Cl. 670 (1971); *Three Affiliated Tribes of Fort Berthold Reservation v. United States,* 182 Ct. Cl. 543, 550-57 (1968). Plaintiff is entitled to monetary damages as a result of Defendant's unconstitutional taking of its land, natural resources, and proceeds from the same in violation of Plaintiff's rights.

## FOURTH CLAIM FOR RELIEF
### (Accounting: Disposition of Land)

85. Plaintiff fully incorporates the foregoing paragraphs and allegations of the Complaint as though set forth fully herein.

86. The Defendant failed to properly and completely account for all land within the exterior boundaries of the Uncompahgre Reservation that has been disposed of since the opening of the Reservation in an accounting and reconciliation consistent with the requirements of generally accepted accounting principles, auditing standards, and law.

87.     Defendant has failed to establish, audit and reconcile tribal trust funds from the disposed-of surplus land within the exterior boundaries of the Uncompahgre Reservation, or to provide an attendant accounting.  Act of December 22, 1987, 101 Stat. 1329.

88.     The Ute Tribe is entitled to a proper and complete accounting, reconciliation, and certification of the land sales, transfers, or exchanges following the opening of the Uncompahgre Reservation pursuant to the 1880, 1894 and 1897 Acts to aid the Court and the Tribe in a final determination of the damages to which the Tribe is entitled.  In addition, the Defendant should be ordered to preserve all records relating to the opening of the Uncompahgre Reservation pursuant to the 1880, 1894 and 1897 Acts.

89.     Congress has further directed that no statute of limitations on any claim for losses to trust assets can begin to run until Tribes have been furnished with such an accounting.  *E.g.,* Act of November 1990, 104 Stat. 1915 (and each subsequent annual Act); *see also Osage Tribe Indians of Oklahoma v. United States,* 68 Fed. Cl. 322, 334 (2005) (limitations do not begin to run until an appropriate accounting is provided, even where plaintiff has actual knowledge of the loss or mismanagement).

### FIFTH CLAIM FOR RELIEF
### (Accounting: Revenue from Mineral and Grazing Leases and Mineral Royalties)

90.     Plaintiff fully incorporates the foregoing paragraphs and allegations of the Complaint as though set forth fully herein.

91.     Revenues collected and generated annually as a result of Defendant's acts and omissions are due to Plaintiff, and Defendant's failure to direct and manage those funds to the benefit of Plaintiff has resulted in losses to Plaintiff, a trust beneficiary.  Defendant has failed to establish, audit and reconcile tribal trust funds derived from the natural resources within the

exterior boundaries of the Uncompahgre Reservation, or to provide an attendant accounting. Act of December 22, 1987, 101 Stat. 1329.

92. The Defendant failed to properly and completely account for all revenue derived from lands on the Uncompahgre Reservation through mineral and grazing leases in an accounting and reconciliation consistent with the requirements of generally accepted accounting principles, auditing standards, and law.

93. The Defendant failed to properly and completely account for all mineral royalties derived from the lands on the Uncompahgre Reservation pursuant to the 1880, 1894 and 1897 Acts in an accounting and reconciliation consistent with the requirements of generally accepted accounting principles, auditing standards, and law.

94. The Ute Tribe is entitled to a proper and complete accounting, reconciliation, and certification of the revenue from mineral and grazing leases and mineral royalties (including oil and gas royalties) derived from the lands on the Uncompahgre Reservation pursuant to the 1880, 1894 and 1897 Acts to aid the Court and the Tribe in a final determination of the damages to which the Tribe is entitled. In addition, the Defendant should be ordered to preserve all records relating to grazing and mineral development on lands located within the Uncompahgre Reservation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for the following:

1. Monetary damages in an amount to be determined at trial, together with pre- and post-judgment interest based on the United States' breach of its constitutional, statutory, regulatory, and fiduciary duties to the Tribe.

2.      An accounting as set forth in counts 4 and 5 above.

3.      Declaratory and injunctive relief to the extent necessary or proper to provide the relief otherwise requested.

4.      An award of the costs of suit incurred by the Ute Indian Tribe, including without limitation, attorneys' fees, expenses, expert costs and all other costs related to this action.

5.      Such other and further relief as the Court shall deem just and proper.

Dated this 5th day of March, 2018.


                                FREDERICKS PEEBLES & MORGAN LLP


                                s/ Jeffrey S. Rasmussen
                                Jeffrey S. Rasmussen, Attorney of Record
                                Jeremy J. Patterson, of Counsel
                                Alvina L. Earnhart, of Counsel
                                Chloe E. Bourne, of Counsel
                                FREDERICKS PEEBLES & MORGAN LLP
                                1900 Plaza Drive
                                Louisville, CO 80027
                                Telephone: (303) 673-9600
                                Facsimile: (303) 673-9155
                                Email: jrasmussen@ndnlaw.com

                                Rollie E. Wilson, of Counsel
                                FREDERICKS PEEBLES & MORGAN LLP
                                401 9th St., N.W., Suite 700
                                Washington, D.C. 20004