**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| UTE INDIAN TRIBE OF THE UINTAH AND OURAY INDIAN RESERVATION, | ) | |
| Plaintiff, | ) | Case No. 1:18-cv-357 L |
| v. | ) | Judge Carolyn Lerner |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**


INTRODUCTION ........ 1

NOTE ON RESERVATION STATUS AND COMPENSABLE TITLE ........ 2

QUESTIONS PRESENTED ........ 3

STATEMENT OF FACTS ........ 4

I. The Creation of the Original Uncompahgre Reservation and its Allotment and Opening to Public Entry ........ 4

II. The 1933 Withdrawal Order, the 1948 Act, and the Hill Creek Extension ........ 7

III. The Tribe's Petitions Under the Indian Reorganization Act ........ 9

IV. The Tribe's Suits Before the ICC and the Tenth Circuit ........ 10

V. Procedural History ........ 12

LEGAL STANDARDS ........ 13

ARGUMENT ........ 14

I. The 1880 Act Did Not Grant the Tribe with a Compensable Interest in the Public Domain Lands ........ 14

A. The plain language of the 1880 Act limited its grant of compensable title to individual allotments of property to members of the Uncompahgre Band in severalty ........ 14

B. Statements made in connection with later related Congressional actions confirm that the 1880 Act did not provide the Tribe with a compensable interest in the Public Domain Lands ........ 18

II. The Tribe's Takings Claim is Barred by 28 U.S.C. § 2501 ........ 22

A. The Tribe's takings claim fails because the government action allegedly giving rise to its claims occurred no later than 1948 ........ 24

B. The Tribe knew (or should have known) that the United States had taken its alleged interests in the Public Domain Lands long before it filed this action ........ 26

III. The Tribe's Takings Claim is Barred by Claim Preclusion and the 1965 Settlement Agreement ........ 30

A. The Tribe has already litigated and settled a claim for the United States alleged taking of the entirety of the original Uncompahgre Reservation ... 30

B. The Tribe waived and released its takings claim in the 1965 Settlement Agreement ... 33

IV. If this Court determines the Tribe does have an Ongoing Compensable Interest in the Public Domain Lands, its Takings Claim Should Be Limited in both Time and Scope ... 36

CONCLUSION ... 37

# TABLE OF AUTHORITIES

## Cases

*Alabama Flake Graphite Co. v. United States*,
125 Ct. Cl. 635 (1953) .......... 37

*Am. Pelagic Fishing Co., L.P. v. United States*,
379 F.3d 1363 (Fed. Cir. 2004) .......... 14

*Ammex, Inc. v. United States*,
334 F.3d 1052 (Fed. Cir. 2003) .......... 31, 32

*Arizona v. Navajo Nation*,
143 S. Ct. 1804 (2023) .......... 38

*Barnhart v. Sigmon Coal Co.*,
534 U.S. 438 (2002) .......... 14

*Brandt v. United States*,
710 F.3d 1369 (Fed. Cir. 2013) .......... 23

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .......... 13

*Confederated Bands of Ute Indians v. United States,*
100 Ct. Cl. 413 (1943) .......... 27

*Confederated Bands of Ute Indians v. United States*,
330 U.S. 169 (l947) .......... 16, 26

*Crater Corp. v. Lucent Techs., Inc.*,
255 F.3d 1361 (Fed. Cir. 2001) .......... 13

*Fid. & Guar. Ins. Underwriters, Inc. v. United States*,
805 F.3d 1082 (Fed. Cir. 2015) .......... 23

*Ford-Clifton v. Dep't of Veterans Affairs*,
661 F.3d 655 (Fed. Cir. 2011) .......... 31

*Gonzalez v. Dep't of Labor*,
609 F.3d 451 (D.C. Cir. 2010) .......... 33

*Hagen v. Utah*,
510 U.S. 399 (1994) .......... 24, 25

*Hallco Mfg. Co. v. Foster*,
256 F.3d 1290 (Fed. Cir. 2001) .......... 30

*Hayt v. United States*,
38 Ct. Cl. 455 (1903) .......... 15

*Jet, Inc. v. Sewage Aeration Sys.*,
223 F.3d 1360 (Fed. Cir. 2000) .......... 32

*John R. Sand & Gravel Co. v. United States*,
552 U.S. 130 (2008) .......... 22

*Karuk Tribe of California v. Ammon*,
209 F.3d 1366 (Fed. Cir. 2000) .......... 14, 16, 17

*King v. Dep't of the Navy*,
130 F.3d 1031 (Fed. Cir. 1997) .......... 33

*Lower Brule Sioux Tribe v. United States*,
102 Fed. Cl. 421 (2011) .......... 32

*McGirt v. Oklahoma*,
140 S. Ct. 2452 (2020) .......... 3, 24

*Merritt-Champman & Scott Corp. v. United States*,
458 F.2d 42 (Ct. Cl. 1972) .......... 34

*Orr v. United States*,
166 Fed. Cl. 1 (2023) .......... 1

*PCL Const. Servs., Inc. v. United States*,
84 Fed. Cl. 408 (2008) .......... 31

*Peckham v. United States*,
61 Fed. Cl. 102 (2004) .......... 34

*San Carlos Apache Tribe v. United States*,
639 F.3d 1346 .......... 23

*San Carlos Apache Tribe v. United States*,
639 F.3d 1346 (Fed. Cir. 2011) .......... 22, 23

*Sharp Kabushiki Kaisha v. Thinksharp, Inc.*,
448 F.3d 1368 (Fed. Cir. 2006) .......... 31

*Shell Oil Co. v. United States*,
130 Fed. Cl. 8 (2017) .......... 17

*Sioux Tribe v. United States*,
500 F.2d 458 (Ct. Cl. 1974) .......... 23

*Solem v. Bartlett*,
465 U.S. 463 (1984) .......... 4

*Swayne v. Lone Acre Oil Co.*,
98 Tex. 597 (1905) .......... 37

*United States v. William Cramp & Sons Ship & Engine Bldg. Co.*,
206 U.S. 118 (1907) .......... 34

*Ute Indian Tribe v. State of Utah (Ute I)*,
521 F. Supp. 1072 (D. Utah 1981) .................................................................. 4, 5, 12, 17

*Ute Indian Tribe v. State of Utah (Ute III),*
773 F.2d 1087 (10th Cir. 1985) ................................................................ 2, 3, 12, 16, 18

*Ute Indian Tribe v. State of Utah*,
716 F.2d 1298 (10th Cir. 1983) ................................................................................. 12

*Ute Indians v. United States*,
45 Ct. Cl. 440 (1910) ................................................................................................. 27

*W. Shoshone Nat. Council v. United States*,
279 F. App'x 980 (Fed. Cir. 2008) ............................................................................ 11

*Yuba Nat. Res., Inc. v. United States*,
904 F.2d 1577 (Fed. Cir. 1990) ................................................................................. 30

**Statutes**

18 U.S.C. § 1151(a) ........................................................................................................ 2

28 U.S.C. § 2501 ....................................................................................................... 22, 36

**Rules**

RCFC 56(a) .................................................................................................................. 13

RCFC 60 ...................................................................................................................... 30

## TABLE OF EXHIBITS


| Exhibit | Description |
|---|---|
| Exhibit 1 | Br. of Appellant Ute Indian Tribe, *Ute Indian Tribe v. State of Utah*, No. 81-1827 (10th Cir. Nov. 25, 1981). |
| Exhibit 2 | Reh'g En Banc Br. of Appellant Ute Indian Tribe, *Ute Indian Tribe v. State of Utah,* No. 81-1827 (10th Cir. May 19, 1984). |
| Exhibit 3 | Message from the President of the United States transmitting a report from the Secretary of the Interior containing an agreement signed by the chiefs and headmen of the Ute Indians, S. Doc. No. 46-114 (2d Sess. 1880). |
| Exhibit 4 | Act of June 15, 1880, Pub. L. No. 46-223, 21 Stat. 199. |
| Exhibit 5 | *Annual Report of the Commissioner of Indian Affairs to the Secretary of the Interior for the Year 1881* (Washington: Government Printing Office, 1881). |
| Exhibit 6 | Letter from Commissioner of Indian Affairs to Secretary of the Interior, (Dec. 30, 1881). |
| Exhibit 7 | Exec. Order of January 5, 1882. |
| Exhibit 8 | MAP - The Three regions of the Uintah and Ouray Reservation |
| Exhibit 9 | Declaration of David Vogt |
| Exhibit 10 | Indian Department Appropriations Act of Aug. 15, 1894, Pub. L. No. 53-290, 28 Stat. 286, 337 (§§ 20-21). |
| Exhibit 11 | Indian Department Appropriations Act of June 7, 1897, Pub. L. No. 55-3, 30 Stat. 62, 87. |
| Exhibit 12 | *Surveys and Examination of Uinta Indian Reservation: Letter from the Secretary of the Interior*, H.R. Doc. 57-671 (1st sess. 1902). |
| Exhibit 13 | Letter from John Collier, Commissioner of Indian Affairs to Secretary of the Interior, (June 12, 1933). |
| Exhibit 14 | Act of June 28, 1934, 48 Stat. 1269 |
| Exhibit 15 | *Letter from John F. Deeds, Acting Director to the Secretary of the Interior, Modification of Grazing Districts Nos. 6 and 8 in the State of Utah, (July 20-, 1935).* |
| Exhibit 16 | Letter from John F. Deeds, Acting Director, Division of Grazing Control, to Secretary of the Interior, (July 19, 1935). |
| Exhibit 17 | Act of March 11, 1948, Pub. L. No. 80-440, 62 Stat. 72, § 1 |
| Exhibit 18 | 13 Fed. Reg. 4105-4106 (Jul. 17, 1948) |
| Exhibit 19 | Act of June 18, 1934, Pub. L. No. 73-383, 48 Stat. 984. |
| Exhibit 20 | Letter from Cran Curry, Chairman, Indian Business Committee, to Harold L. Ickes, Secretary of the Interior, (Dec. 27, 1934). |
| Exhibit 21 | Letter from John Collier, Commissioner of Indian Affairs, to Harold L. Ickes, Secretary of the Interior, secretarial approval dated Sep. 19, 1934, (Aug. 10, 1934). |
| Exhibit 22 | Letter from Harold L. Ickes, Secretary of the Interior to Cran Curry, Chairman, Indian Business Committee, (Jan. 12, 1935). |
| Exhibit 23 | Letter from Oscar L. Chapman, Assistant Secretary of the Interior to Ernest L. Wilkinson, Esq., (Feb. 3, 1939). |
| Exhibit 24 | Letter from Chairman of Ute Tribe Business Committee to Secretary of the Interior, 4/25/2017. |

| | |
|---|---|
| Exhibit 25 | Letter from Deputy Secretary of the Interior to Chairman of Ute Tribe Business Committee, 3/2/2018. |
| Exhibit 26 | Pet., *Ute Indian Tribe of the Uintah and Ouray Reservation v. United States*, No. 349 (Ind.Cl. Comm. Aug. 11, 1951). |
| Exhibit 27 | Findings of Fact on the Stipulated Settlement of Claims & Offsets, *Ute Indian Tribe of the Uintah and Ouray Reservation v. United States*, No. 349, 14 Ind. Cl. Comm. 707 (Feb. 18, 1965). |
| Exhibit 28 | Final J., *Ute Indian Tribe of the Uintah and Ouray Reservation v. United States*, No. 349, 14 Ind. Cl. Comm. 728a (Feb. 18, 1965). |
| Exhibit 29 | February 4, 1953 Hearing Transcript, *Ute Indian Tribe of the Uintah and Ouray Reservation v. United States*, No. 349 (I.C.C. Aug. 11, 1951). |
| Exhibit 30 | Petr's Opp'n to Mot. for Summ. J., Ute *Indian Tribe of the Uintah and Ouray Reservation v. United States*, No. 349 (Ind. Cl. .Comm.. May 15, 1956). |
| Exhibit 31 | Opp'n to Mot. for More Definite Statement, Docket No. 349 |
| Exhibit 32 | May 19, 1965 Hr'g Tr., *Ute Indian Tribe of the Uintah and Ouray Reservation v. United States*, No. 349 (Ind. Cl. Comm.). |
| Exhibit 33 | Report of Claims Counsel to the Ute Indian Tribe - Settlement of Indian Claims Commission Docket 349 (Sept. 24, 1964). |
| Exhibit 34 | Act of May 5, 1864, 13 Stat. 63. |
| Exhibit 35 | S. 1762, 51st Cong., 1st sess., (1890). |
| Exhibit 36 | H. R. 5360, 51st Cong., 1st sess., (1890). |
| Exhibit 37 | S. 1762, 51st Cong., 1st sess., (1890). |
| Exhibit 38 | H.R. Rep. No. 51-1605, to accompany H. R. 5360, 1st sess., (1890). |
| Exhibit 39 | S. Ex. Doc. No. 51-157 (1st sess. 1890). |
| Exhibit 40 | Senate Rep. No. 52-240, to accompany S. 574 (1st sess. 1892). |
| Exhibit 41 | H.R. Rep. No. 52-1076, to accompany H. R. 69 (1st sess. 1892). |
| Exhibit 42 | H.R. 4511, 53rd Cong., 2nd sess. (1893). |
| Exhibit 43 | Letter from John I. Hall, Assistant Attorney General to Secretary of the Interior, (Oct. 23, 1893). |
| Exhibit 44 | Letter from John I. Hall, Assistant Attorney General to Secretary of the Interior, (Feb. 16, 1894). |
| Exhibit 45 | Letter from Acting Commissioner of Indian Affairs to Secretary of the Interior, (Dec. 16, 1893). |
| Exhibit 46 | Letter from Hoke Smith, Secretary of the Interior to Chairman of the House Committee on Indian Affairs, (Mar. 22,1894). |
| Exhibit 47 | H. R. Rep. No. 53-660, to accompany H.R. 6557 (2nd Sess. 1894). |
| Exhibit 48 | H.R. 6557, 53rd Cong., 2nd sess. (1894). |
| Exhibit 49 | S. Rep. No. 53-450, to accompany S. 1887, 53rd Cong. (2nd sess. 1894) |
| Exhibit 50 | Cong. Rec., Senate, 53rd Cong., 2nd sess., Vol. 26, (July 19, 1894). |
| Exhibit 51 | Cong. Rec., Senate, 54th Cong., 1st sess., Vol. 28, (Mar. 17, 1896). |
| Exhibit 52 | Cong. Rec. Senate, 54th Cong., 2nd sess., Vol. 29, (Feb. 22, 1897), pp. 2090-2094. |
| Exhibit 53 | Cong. Rec., House, 55th Cong., 1st sess., Vol. 30, (Apr. 22, 1897). |
| Exhibit 54 | Cong. Rec., House, 55th Cong., 1st sess., Vol. 30, (Apr. 23, 1897). |
| Exhibit 55 | Cong. Rec., Senate, 55th Cong., 1st sess., Vol. 30, (Apr.14, 1897). |

| | |
|---|---|
| Exhibit 56 | H.R. Rep. No. 80-1372, (2d sess. 1948). |
| Exhibit 57 | Letter from Warner W. Gardner, Solicitor for the Department of the Interior to Ernest L. Wilkinson, Esq., Attorney for the Ute Indians, (Apr. 3, 1946). |
| Exhibit 58 | Ute General Council Meeting Minutes (Aug. 11, 1945). |
| Exhibit 59 | 1986 US Amicus Brief |
| Exhibit 60 | 1986 US Supplemental Memo for Amicus Curiae |
| Exhibit 61 | 43 C.F.R § 161, 1949 ed. |
| Exhibit 62 | James Muhn and Hanson R. Stuart, *Opportunity and Challenge: The Story of BLM* (BLM 1988) |
| Exhibit 63 | Minutes of Advisory Board Meeting, Utah Grazing District No. 8, (Aug.7-8, 1963). |
| Exhibit 64 | BLM, "50 Years of Public Land Management, 1934-1984," (U.S. DOI, BLM, 1984). |
| Exhibit 65 | BLM, Final Environmental Impact Statement on the Book Cliffs Resource Management Plan (Nov. 1984). |
| Exhibit 66 | BLM, Billing Statement, (Mar. 7, 1975). |
| Exhibit 67 | BLM, Grazing Permit, (Mar. 30, 1992). |
| Exhibit 68 | Resolution No. 01-142, Uintah and Ouray Tribal Business Committee, (May 16, 2001). |
| Exhibit 69 | Letter from Martin Mangan, Acting Commissioner of Indian Affairs to Director, BLM (Mar. 12, 1962). |
| Exhibit 70 | Declaration of Terence Kehoe, PhD |

## INTRODUCTION

Over forty years ago, the Ute Indian Tribe of the Uintah and Ouray Indian Reservation (the "***Tribe***")—appearing before a panel of the Tenth Circuit Court of Federal Appeals, and later the Tenth Circuit sitting en banc—affirmed "[a]s occupants of an Executive Order reservation, the Uncompahgre Indians (like all Indians occupying executive Order Reservations) do not as a matter of law have compensable title to their lands." EXHIBIT 1 at UTEDIS0425145; *see also* EXHIBIT 2 at UTEDIS0424940 (stating the Tribe does not have "'title' to the lands because the Uncompahgre Reservation is an executive order reservation"). Contrary to its prior representations to a federal court, the Tribe now claims the opposite and asserts that the original Uncompahgre Reservation was created by an act of Congress, which "created the Tribe's 'recognized title' to the lands in the Uncompahgre Reservation." Resp. in Opp'n to Mot. to Dismiss, ECF No. 20, at 1; *see also* Compl., ECF No. 1, ¶¶ 16–17. According to the Tribe, this "recognized title" means it is due compensation under the Fifth Amendment for the United States' use and alienation of those public lands located within the boundaries of the original reservation.

Before its claim can proceed, however, the Tribe must first demonstrate that it possesses a compensable interest in the lands at issue. *Orr v. United States*, 166 Fed. Cl. 1, 48 (2023). But, even setting aside its prior admissions, the Tribe has not and cannot meet this burden. By their express terms, the statutes at issue were limited to providing eligible members of the Tribe with individual allotments of land. And other than certain lone voices, no one has adopted the viewpoint that those statutes gave the Tribe a compensable interest in the lands located within the boundaries of the original Uncompahgre Reservation or that any such interest was not extinguished more than a century ago. More than that, the Tribe has been aware of this fact and

the United States' sole ownership of and complete dominion over the lands at issue for decades, such that any takings claim is also barred by this Court's six-year statute of limitation.

Even assuming the Tribe has a compensable property interest in the subject lands, the Court can (and should) still grant this motion. With the benefit of fact discovery, the record evidence now clearly shows that the Tribe knew of the alleged taking before congress established the Indian Claims Commission ("***ICC***") in 1946, asserted a claim for the United States' alleged taking of the entirety of the Uncompahgre reservation before the ICC, and subsequently settled and released that claim. Accordingly, even if the Tribe had a compensable property interest and its takings claim was not time barred, the Court should decline to consider the merits of the Tribe's takings claim because the Tribe litigated and released that claim sixty years ago.

For all of these reasons, and as discussed further below, the United States is entitled to summary judgment on the Tribe's takings claim as a matter of law.

**NOTE ON RESERVATION STATUS AND COMPENSABLE TITLE**

As an initial matter, it is important to address the distinction between whether a given geographical area within an Indian reservation is "Indian country"[1] for purposes of Federal and Tribal jurisdiction and whether a tribe can claim "compensable title" to the lands located within that reservation's external boundaries. As this Court has already recognized, "title and reservation status are not congruent concepts." Order, ECF No. 27 at 11 (citing *Ute Indian Tribe v. State of Utah* ("***Ute III***"), 773 F.2d 1087, 1097 (10th Cir. 1985) (Seymour, J., concurring)). Rather, a reservation (and "Indian country") can exist even where the tribe does not hold a

[1] Congress has defined "Indian country," to include as "all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation." 18 U.S.C. § 1151(a).

compensable interest in all lands located within the reservation's boundaries. *See Ute III*, 773 F.2d at 1097*; see also McGirt v. Oklahoma*, 140 S. Ct. 2452, 2468 (2020) ("[O]nce a block of land is set aside for an Indian reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise."). Thus, in *Ute III*, a majority of the Tenth Circuit, sitting en banc, held that the original Uncompahgre Reservation remained "Indian country" while also recognizing "[t]he fact that the Uncompahgres did not own the land within th[at] reservation." 773 F.2d at 1097 n.7 (Seymour, J., concurring).

Whether or not the land located within the boundaries of the original Uncompahgre Reservation constitutes "Indian country" is not at issue in this case. As noted above, the Tenth Circuit has determined that Congress did not "diminish or disestablish the Uncompahgre . . . Reservation." *Id.* at 1093. That holding is not at issue here. Nor is it relevant. Rather, the key issue before this Court is whether the Tribe held compensable "'recognized title' to the lands in the Uncompahgre Reservation," Order, ECF No. 27 at 11-12, regardless of whether those lands constitute "Indian country."

**QUESTIONS PRESENTED**

1) Did the Act of June 15, 1880 provide the Tribe with a compensable interest in the public lands located within the external boundaries of the original Uncompahgre Reservation?

2) If the Act of June 15, 1880 did provide the Tribe with a compensable interest in the lands at issue, did the Tribe hold such an interest within the statutory limitations period?

3) Is the Tribe's takings claim barred because it previously raised, settled, and waived that claim in proceedings before the ICC?

## STATEMENT OF FACTS

### I. The Creation of the Original Uncompahgre Reservation and its Allotment and Opening to Public Entry.

The Tribe is a federally recognized Indian Tribe, made up of three of the bands of Ute people: the Uintah Band, the Whiteriver Band, and the Uncompahgre Band. ECF No. 1 ⁋ 3. The Tribe is located in the Uintah Basin of northeastern Utah within two historically separate and contiguous reservations: the Uintah Valley Reservation and the Uncompahgre Reservation. *Id.* ⁋⁋ 3-4. By executive order, President Abraham Lincoln designated the Uintah valley as a reservation for the Tribe on October 3, 1861, and Congress confirmed its establishment on May 5, 1864. EXHIBIT 1 at UTEDIS0425124-25; *Ute Indian Tribe v. State of Utah* ("***Ute I***"), 521 F. Supp. 1072, 1094-95 (D. Utah 1981), *aff'd in part, rev'd in part*, 716 F.2d 1298 (10th Cir. 1983), on *reh'g*, 773 F.2d 1087 (10th Cir. 1985). The Tribe's interests in the Uintah Valley Reservation are not at issue in this lawsuit. Compl., ECF No. 1 ⁋ 4.

The origin of the Uncompahgre Reservation dates back to 1880 when the Uncompahgre Band agreed that it would "cede to the United States all territory of the [then-]present Ute Reservation in Colorado"[2] and relocate elsewhere in Colorado or the Utah Territory on "[a]llotments[3] in severalty" (the "***1880 Agreement***"). EXHIBIT 3 at UTEDIS0418464-66; *Ute I*,

---

[2] In 1868 several bands of the Ute people, including the Tabeguache (now known as the Uncompahgre) Band, entered into a treaty with the United States whereby they obtained a reservation in the Territory of Colorado in exchange for relinquishing their claims and rights to any portion of the United States or its territories. 15 Stat. 619-620, Arts. II-III (Mar. 2, 1868).

[3] "Allotment" refers to Congress's past practice of "dividing" or allotting communal Indian lands into individualized parcels for private ownership by tribal members. *See Solem v. Bartlett*, 465 U.S. 463, 466-67 (1984). The term "un-alloted lands" as used hereinafter refers to lands within a reservation that were not assigned or associated with any particular Indian claimant and left open for non-Indian settlement.

521 F. Supp. at 1096.[4] Congress enacted a modified version of the 1880 Agreement through the Act of June 15, 1880 (the "***1880 Act***"). *See generally* EXHIBIT 4. Under the 1880 Act, the Uncompahgre Band was

> to remove to and settle upon agricultural lands on Grand River, near the mouth of the Gunnison River, in Colorado, if sufficient quantity of agricultural land shall be found there, if not then upon such other unoccupied agricultural lands as may be found in that vicinity and in the Territory of Utah.

*Id.*, at § 1, 200. As with the 1880 Agreement, the 1880 Act provided for allotment "in severalty" of the lands where the Uncompahgre Band was to be resettled and authorized the President to appoint a commission to identify eligible Indians and allot land to them within the prescribed areas. *Id*, § 2 at 202-203. The Act also directed the Secretary of the Interior to identify "a sufficient quantity of land in the vicinities named ..., to secure the settlement in severalty of said Indians...." *Id.*, § 3 at 203. Once the Secretary had done so, and the allotment process was completed, the Act directed that "all the lands not so allotted, the title to which is [by this agreement] released and conveyed to the United States, shall be held and deemed to be public lands . . . ." *Id*.

A commission appointed under the 1880 Act determined that "the land on the Grand River near the mouth of the Gunnison" was "unsuitable for the Indians for agricultural or grazing purposes" and ultimately selected lands for the Uncompahgre Band in the Utah Territory along the Green, White, and Duchesne rivers. EXHIBIT 5 at UTEDIS424918-20. The Secretary of the Interior approved the selection of these lands, and by the end of October 1881, Federal authorities had completed the removal of the Uncompahgre Band to the Utah Territory. *Id*.

---

[4] For its part, the White River Band "agree[d] to remove to and settle upon agricultural lands on the Uintah [Valley R]eservation in Utah." EXHIBIT 3 at UTEDIS0418465.

In late-December 1881, the Commissioner of Indian Affairs informed the Secretary of the Interior of potential "trouble" between livestock operators who had "been in the habit of herding and grazing their cattle upon portions of the lands recently selected for the use of the Uncompahgres" and the newly arrived members of the Uncompahgre Band. *See* EXHIBIT 6 at UTEDIS0372189-90. The Commissioner also expressed concern about having enough suitable lands to allocate among the Indians as individual allotments and urged that a large area of land with "definite boundaries" be set aside as a "precautionary measure" to increase the likelihood of having sufficient lands available for allotment. *Id.*, at UTEDIS0372192-94. In 1882, President Chester A. Arthur signed an executive order delineating lands to be "withheld from sale and set apart as a reservation for the Uncompahgre Utes" (the "***1882 Executive Order***"). EXHIBIT 7 at UTEDIS0384694-96. The boundaries of the original Uncompahgre Reservation, as described in the 1882 Executive Order, and those of the original Uintah Valley Reservation are shown on the map attached as EXHIBIT 8. *See* EXHIBIT 9 ¶¶ 1-6.

A little over a decade later, in 1894, Congress passed an act authorizing allotment of the original Uncompahgre Reservation into individualized parcels and requiring that any un-allotted lands be "restored to the public domain and made subject to entry [under the homestead and mineral laws of the United States]" (the "***1894 Act***"). EXHIBIT 10 §§ 20-21 at 337. The 1894 Act further required members of the Uncompahgre Band to pay $1.25 an acre for any allotment, which would be drawn from a fund established for proceeds from the sale of the band's Colorado Reservation. *Id.* § 21 at 337. Members of the Uncompahgre Band protested the payment provision, and no allotments were certified under the 1897 Act. Compl., ECF No. 1 ¶ 29.

The "[c]ontinuing reluctance on the part of the Uncompahgre Utes to take allotments, as well as problems with the Uintah Utes[,] who by the 1894 Act were also to negotiate the

allotment of the Uintah Valley Reservation, led Congress to enact new legislative authority [in 1897] allotting the Uncompahgre Reservation and opening the unallotted lands to location and entry under certain of the public land laws" (the "***1897 Act***"). EXHIBIT 1 at UTEDIS0425126-27; EXHIBIT 11 at 87. The 1897 Act removed the requirement that members of the Uncompahgre Band pay for their individual allotments and provided that un-allotted lands would, on and after April 1, 1898, be "open for location and entry under all the land laws of the United States." EXHIBIT 11 at 87. The 1897 Act also reserved title to all lands containing gilsonite, asphalt, and other like substances for the United States. *Id.* Ultimately, 83 allotments were issued within the original Uncompahgre Reservation, but most of the Uncompahgre Band took allotments on the Uintah Valley Reservation at the cost of $1.25 an acre. *See* EXHIBIT 1 at UTEDIS0425127; EXHIBIT 12 at UTEDIS0384541.

## II. The 1933 Withdrawal Order, the 1948 Act, and the Hill Creek Extension.

Following allotment, "there was very little non-Indian activity within" the boundaries of the original Uncompahgre Reservation. Compl., ECF No. 1 ¶ 36. By the 1920s, however, non-Indian settlers within the reservation's boundaries had increased to the point where their activities began to threaten the "Tribe's growing livestock industry." *Id.* In response, in 1933, the Secretary of the Interior temporarily withdrew the "vacant and un-entered lands within the area embraced in [the] Executive Order of January 5, 1882," from further disposition while Congress considered the matter (the "***1933 Order***"). EXHIBIT 13 at UTEDIS0387370.

In June 1934, President Roosevelt signed the Taylor Grazing Act, which was designed to prevent overgrazing on public lands and bring stability to the livestock industry. *See* EXHIBIT 14. The Taylor Grazing Act allowed the Secretary of the Interior to establish grazing districts across the United States and issue permits to qualified citizens for use of the public range. *Id.* §§

1, 3. In July 1935, the United States included the lands covered by the 1933 Order—the "vacant and un-entered lands" within the boundaries of the original Uncompahgre Reservation—in a grazing district established under the Taylor Grazing Act. EXHIBIT 15 at UTEDIS0387365; EXHIBIT 16 at UTEDIS0387363-64. While the lands would be "placed temporarily under range management in accordance with the provisions of the Taylor Grazing Act," the 1933 Order remained in place and the Federal officials administering the district's grazing lands were to obtain the Commissioner of Indian Affairs' approval on policy matters. *See* EXHIBIT 16 at UTEDIS0387363. This arrangement was later extended "until such final action ha[d] been taken by Congress." Compl., ECF No. 1 ¶ 47.

In 1948, Congress passed legislation that increased the Uintah Valley Reservation to include 500,000 additional acres of grazing lands (the "***Hill Creek Extension***"), including more than 270,000 acres located within the boundaries of the original Uncompahgre Reservation (the ("***1948 Act***"). EXHIBIT 1 at UTEDIS0425133; Compl., ECF No. 1 ¶¶ 52, 59; EXHIBIT 17 § 1 at 72-77.[5] The 1948 Act also directed the Secretary of the Interior to revoke the 1933 Order. EXHIBIT 17 § 2 at 77. In a subsequent order that same year, the Secretary directed that the "remaining lands" described in the 1933 Order, but not included in the Hill Creek Extension (the "***Public Domain Lands***"), "be administered for grazing purposes under applicable laws." EXHIBIT 18 at 4105. Since then, the Public Domain Lands have been managed by the Bureau of Land Management (the "***BLM***") and are now administered for multiple-use and sustained yield. Compl. ECF No. 1 ¶ 55; Vernal Resource Management Plan, *available at* https://eplanning.blm.gov/eplanning-ui/project/68145/510 (last visited 7/13/23). It is these

[5] The boundaries of the Hill Creek Extension, as described in the 1948 Act, are shown on Exhibit 8. EXHIBIT 9 ¶ 7.

Public Domain Lands that the Tribe claims have been taken by the United States in violation of the Fifth Amendment.

## III. The Tribe's Petitions Under the Indian Reorganization Act

In 1934 Congress passed the Indian Reorganization Act (the "***IRA***"). *See* EXHIBIT 19. Section 3 of the IRA grants the Secretary of the Interior the discretionary authority, if he determines it to be in the public interest, "to restore to tribal ownership the remaining surplus lands of any Indian reservation heretofore opened, or authorized to be opened, to sale, or any other form of disposal by Presidential proclamation, or by any of the public land laws of the United States." *Id.* § 3, at 984. Following passage of the IRA, the Tribe has sent three petitions to the Secretary of the Interior seeking tribal ownership of the Public Domain Lands pursuant to section 3 of the IRA. Of course, implicit in such requests is the idea that the Public Domain Lands were not then tribal lands.

First, in December 1934, the Tribe wrote to the Secretary of the Interior acknowledging "the old Uncompahgre Reservation was public domain and that the[ Tribe] had no title to it" but petitioning for an interest in "certain portions," along with additional lands outside the exterior boundaries of the historic reservation area. EXHIBIT 20 at UTEDIS0331683. The Secretary had previously determined that portions of the Uintah and Ouray Reservation were eligible for restoration under section 3. EXHIBIT 21.[6] But Secretary Ickes responded to the Tribe's

---

[6] In September 1934, Secretary of the Interior Harold Ickes approved a recommendation that "lands, the proceeds of which, if sold, would be deposited in the Treasury of the United States for the benefit of the Indians," be temporarily withdrawn from disposal of any kind. *Id.* at UTEDIS0336575. The recommendation listed lands on numerous reservations, organized by state, with citation to the "acts, under which such 'openings' occurred." *Id.* at UTEDIS0336573. While the recommendation included the "Uintah and Ouray Reservation" and cited the operative statutes that made the Uintah Valley portion eligible for restoration (32 Stat. 263), it did not reference the Uncompahgre Reservation or the 1894 or 1897 Acts.

December 1834 letter by explaining that the 1897 Act had returned the un-allotted lands of the original Uncompahgre Reservation back to the public domain, such that those lands "are not recognized as being of the class intended for restoration to tribal ownership under section 3 of the [IRA]." EXHIBIT 22 at UTEDIS0330877.

In 1938, the Tribe again the raised the possibility of the Interior Department taking the Public Domain lands into trust under section 3 of the IRA. EXHIBIT 23 at UTEDIS0368118. In reply, the Assistant Secretary of the Interior outlined the history of the Public Domain Lands, concluding "that no tribal rights or equities to this area were established in the Uncompahgres by the Executive Order of January 5, 1882, establishing the reservation," and that the remaining lands were not the kind addressed by Section 3 of the IRA. *Id.*

Finally, in April 2017, the Tribe asked the Secretary of the Interior to "restore trust status to [the Public Domain Lands] under section 3 of the [IRA]." EXHIBIT 24 at Uncompahgre0000052. On March 2, 2018, the Deputy Secretary of Interior denied the Tribe's restoration request, relying on an opinion from the Office of the Solicitor concluding that the Congress did not intend for the Tribe to have a "compensable ownership interest" in the Public Domain Lands and, thus, those lands were not eligible for restoration under section 3. EXHIBIT 25 at Uncompahgre0000698.[7]

## IV. The Tribe's Suits Before the ICC and the Tenth Circuit.

Over the years, the Tribe and its predecessor entities have been a party to numerous court proceedings concerning tribal jurisdiction, the 1880 Agreement, and the historical dispossession

---

[7] This third denial is the subject of a separate legal challenge under section 706 of the Administrative Procedure Act pending in the Federal District Court for the District of Columbia. *See Ute Indian Tribe of the Uintah & Ouray Indian Reservation v. United States, et al.*, No. 1:18-cv-00546 (D.D.C.) (Nichols).

of, and compensation for, lands in Colorado and Utah. Two of these cases are of particular relevance here.

First, on August 11, 1951, the Ute Indian Tribe, on behalf of the Uncompahgre Band, asserted claims against the United States before the ICC[8] (the "***ICC Action***"). *See* EXHIBIT 26. The Tribe's petition (the "***1951 Petition***") among other things, included allegations that the United States: (1) "disposed of all lands in the Utah reservation for the Uncompahgre Utes as set forth in paragraphs 9 and 10 hereof without just compensation," (2) "fail[ed] or refus[ed] to provide an adequate reservation," (3) "fail[ed] or refus[ed] to provide any reservation," and (4) failed to "maint[ain] the Uncompahgre Reservation in Utah as a reservation for said Uncompahgre Utes." *Id*. ¶¶ 10–12. As compensation, the Tribe sought, among other things, "the value of the [land], taken from th[e Tribe] by the [1897 Act]…, together with the value of the use or income of the said lands." *Id.* at UTEDIS042264 (prayer for relief).

In 1965, and after further years of litigation, the Tribe and the United States "arrived at a compromise and settlement of all issues in [the ICC Action]" (the "***1965 Settlement Agreement***"). *See* EXHIBIT 27 ¶ 3. Under the 1965 Settlement Agreement, the Tribe stipulated and agreed that: "the entry of a final order . . . shall finally dispose of all claims or demands which the petitioner has asserted or could have asserted against the defendant . . . and petitioner shall be barred from asserting all such claims or demands in any further action." *Id.* ¶ 4 (2). A

8 Congress created the ICC in 1946 through the Indian Claims Commission Act and empowered it to hear "the Indian Tribes' historical claims against the United States for the taking of land and related actions." *W. Shoshone Nat. Council v. United States*, 279 F. App'x 980, 982 (Fed. Cir. 2008). The ICC had "exclusive jurisdiction to hear claims brought within five years of the passage of the [Indian Claims Commission] Act," with the result that "Indian claims existing on August 13, 1946 had to be filed by August 13, 1951 or be barred forever." *Id*.

final judgment confirming the 1965 Settlement Agreement was entered on February 18, 1965 (the "***ICC Judgment***"). *See* EXHIBIT 28.

Second, in 1975, the Tribe filed an action against several Utah municipalities to establish its jurisdiction within the exterior boundaries of "the Uintah and Ouray Reservation"—defined by the Tribe as encompassing lands within the exterior boundaries of both the Uintah Valley Reservation and the original Uncompahgre Reservation—and restrain the defendants from interfering with the enforcement of the Tribe's Law and Order Code. *Ute I*, 521 F. Supp. at 1075-78. Through this litigation, the Tribe sought to establish "that all of the lands encompassed [within the boundaries of the Uintah and Ouray Reservation] are 'Indian country' as defined by federal statute." *Id.*, at 1078. After years of litigation, the trial court held that the Uncompahgre Reservation had been disestablished and did not constitute "Indian country." *Id*. at 1155.

The Tribe appealed to the Tenth Circuit. *See Ute Indian Tribe v. State of Utah*, 716 F.2d 1298 (10th Cir. 1983). While arguing that the original Uncompahgre Reservation had not been disestablished, *see* "Note on Reservation Status and Compensable Title," *supra*, the Tribe repeatedly acknowledged that it did not "have compensable title to [the Public Domain Lands]." EXHIBIT 1 at UTEDIS0425127, UTEDIS0425143-45; EXHIBIT 2 at UTEDIS0424940. The Tenth Circuit agreed with the Tribe, holding that the Uncompahgre Reservation had not been disestablished but also noting that the Tribe had never held compensable title to the original Uncompahgre Reservation. *Ute III*, 773 F.2d 1087, 1093, 1097 n.7 (Seymour, J., concurring).

## V. Procedural History

The Tribe brought this case in 2018 seeking $500,000,000 in monetary damages based on an alleged breach of trust (claim 1), violation of congressional acts (claim 2), and violation of the Tribe's Fifth Amendment rights (claim 3). ECF No. 1 ¶¶ 65-84. The Tribe also sought an order

mandating the United States provide an accounting and preserve relevant records (claims 4 and 5). *Id.* ¶¶ 85-94. The United States moved to dismiss. *See* Mot. to Dismiss, ECF No. 15.

On November 4, 2019, the Court entered an order dismissing the Tribe's breach of trust and statutory violation claims but denying the United States Motion with respect to the Tribe's takings claim. ECF No. 34, at 33-34.[9] With respect to the takings claim, the Court identified the Tribe's contention that "the 1880 Act created its 'recognized title' to the lands in the Uncompahgre Reservation" as the lynchpin of its claim and stated that "[a]n opportunity to rule on the soundness of this premise would facilitate resolution of this case." *Id*., at 11, 33-34. In keeping with this ruling, the Court limited "discovery and any related dispositive motions" to the issue of the Tribe's alleged compensable interest in the Public Domain Lands. *See* ECF No. 40. The present motion addresses that issue.[10]

**LEGAL STANDARDS**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). The moving party has the burden of showing "the absence of any genuine issue of material fact and entitlement to judgment as a matter of law." *Crater Corp. v. Lucent Techs., Inc.*, 255 F.3d 1361, 1366 (Fed. Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)). The nonmoving party then bears the burden of establishing, by a showing of specific facts, that there are genuine issues of material fact for trial. *See Celotex*, 477 U.S. at 324–25. For claims under

[9] The Court reserved judgment on the Tribe's requests for an accounting, noting that it "lacks jurisdiction to provide declaratory and injunctive relief, but . . . may order an accounting in aid of judgment if the Tribe establishes a taking." *Id*., at 34 n.17. Thus, if the Court determines that the Tribe does not have a viable takings claim, the accounting claims would also need to be dismissed.

[10] Should the Tribe's takings claim proceed, the United States reserves it rights to move for summary judgment on other issues in advance of any trial.

the Fifth Amendment, the Plaintiff bears the burden, "as a threshold matter," to demonstrate it has a valid property interest at the time of the alleged taking. *Am. Pelagic Fishing Co., L.P. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004). "If the claimant fails to demonstrate the existence of a legally cognizable property interest, the court[']s task is at an end." *Id.*

## ARGUMENT

### I. The 1880 Act Did Not Grant the Tribe with a Compensable Interest in the Public Domain Lands.

Summary judgment should be granted in favor of the United States on the Tribe's takings claim because the Tribe has never had a compensable property interest in the Public Domain Lands. The text of the 1880 Act does not support the Tribe's assertion that the Act conveyed "recognized title" to the lands within boundaries of the original Uncompahgre Reservation to the Tribe. Instead, the 1880 Act provides that sole title to the Public Domain Lands reverted to the United States following allotment. And interpretations of the 1880 Act made in connection with subsequent Congressional enactments confirm this conclusion.

#### A. The plain language of the 1880 Act limited its grant of compensable title to individual allotments of property to members of the Uncompahgre Band in severalty.

"As in all statutory construction cases, [this Court must] begin with the language of the statute." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002). "When Congress intends to delegate power to turn over lands to the Indians permanently, one would expect to and doubtless would find definite indications of such a purpose." *Karuk Tribe of California v. Ammon*, 209 F.3d 1366, 1375 (Fed. Cir. 2000). Here the language of the 1880 Act is unambiguous. The Act confirms and states the terms of the 1880 Agreement, whereby the Uncompahgre Band agreed to (1) "cede to the United States all the territory of the present Ute Reservation in Colorado", (2) "remove to and settle upon . . . . unoccupied agricultural lands as may be found . . . in the

Territory of Utah", and (3) take title to these lands as "*[a]llotments in severalty*." EXHIBIT 4 § 1 at 200-02 (emphasis added).

The 1880 Act sets forth how the allotment process was to be accomplished: the President would appoint a commission to identify eligible members of the Uncompahgre Band and "select lands and allot them in severalty to said Indians, as herein provided, and superintend the removal, location, and settlement of the Indians thereon." *Id*. §§ 2-3 at 202-03. And the Act clearly states that title to all lands not allotted is "released and conveyed to the United States, . . . held and deemed to be public lands of the United States . . . ." *Id.* § 3 at 203. In short, and rather than providing *the Tribe* with a compensable interest in the Public Domain Lands, the 1880 Act unambiguously limits the conveyance of compensable title to *individual members* of the Uncompahgre Band "in [their] own right, with no other person or community or tribe connected with the holder in point of interest." SEVERALTY, Black's Law Dictionary (11th ed. 2019).

Nor did the 1880 Act recognize any pre-existing compensable interest in the Public Domain Land prior to enactment, and the Tribe held no such interest. As the Principal Deputy Solicitor for the Department of Interior explained in evaluating the Tribe's most recent restoration request:

> In 1863, the [Uncompahgre] Band entered into a treaty with the United States whereby they relinquished all claim to any and all of their lands within territory of the United States, wherever situated, in exchange for a reservation of lands within the Territory of Colorado. 13 Stat. 673 (Dec. 14, 1864)[ (the "***1864 Treaty***")]. Prior to ratification, the United States Senate amended the treaty terms to clarify that the claimed exclusive rights were only as against all other Indian tribes and that nothing in the treaty would be construed to admit, on the part of the United States, any greater title or interest in the lands so excepted and reserved than existed upon the United States['] acquisition of the territory from Mexico. *See Hayt v. United States*, 38 Ct. Cl. 455, 460-465 (1903) (detailing history of Ute land tenure from Spanish rule and Mexican cession under the Treaty of Guadalupe Hidalgo, 9 Stat. 922, 930, to the first treaty with the

> United States, 9 Stat. 984). Absent recognized land grants (e.g., Pueblo and Mission Indian), Mexican law did not consider "aboriginal title" of any particular Indian group beyond a right of occupancy within their accustomed territories. Thus, the United States did not recognize these areas as "Indian country" upon cession from Mexico until initial treaties and assignment of reservations established them as such. The 1868 Treaty[, which resulted in the creation of Uncompahgre Band's Colorado reservation], incorporated the provisions of the [1864 Treaty] to the extent they were not inconsistent. 9 24 Stat. 548 (Mar. 3, 1887).

EXHIBIT 25 at Uncompahgre0000701 n. 8; s*ee also Confederated Bands of Ute Indians v. United States*, 330 U.S. 169, 178-79 (l947) (noting that "[t]he only lands for which Congress agreed in 1880 to compensate the Indians were those that 'the title to which' the Indians then 'released and conveyed to the United States.' They could only release and convey the lands that belonged to them, and only the lands given to them by the original 1868 treaty belonged to them.").

Going further, the 1880 Act did not mandate the creation of a reservation, much less convey "the definite intention" to transfer permanent title in the Public Domain Lands to the Tribe. *See Karuk Tribe*, 209 F.3d at 1374. As the Tenth Circuit noted in *Ute III*, "[n]othing in the 1880 Act required [President Arthur to issue the 1882 Executive Order]; in fact, the Secretary and the Commissioner had been empowered [by the 1880 Act] to designate appropriate land for allotment." 773 F.2d at 1096-97 (Seymour, J., concurring). The 1880 Act provided sufficient instruction and authority to settle the Uncompahgre Band in the Utah territory without further Presidential action (other than approving the final allotments and "caus[ing] patents to issue"). EXHIBIT 4 § 3 at 203. And, as set forth in the Statement of Facts, *supra*, the Uncompahgre Band was completely relocated to the Utah Territory by the end of October 1881 under this authority. Indeed, President Arthur did not issue the 1882 Executive Order establishing the Uncompahgre Reservation until January 1882, and then only after the Commissioner of Indian

Affairs advised the Secretary of the Interior that a large area of land with "definite boundaries" should be set aside as a "precautionary measure." *See* EXHIBIT 7; EXHIBIT 6 at UTEDIS0372189-94. The 1880 Act's silence as to the establishment of a reservation and the necessity of the 1882 Executive Order to establish the same, is another reason the Tribe does not hold compensable title to the Public Domain Lands "as a matter of law." EXHIBIT 1 at UTEDIS0425145; *see also Karuk Tribe*, 209 F.3d at 1374 (Fed. Cir. 2000) ("The President has no authority to convey any interest in public lands without a clear and definite delegation in an Act of Congress.").

The fact that the express terms of the 1880 Act did not convey a compensable property interest to the Tribe is further demonstrated when contrasted with the 1864 statute confirming President Lincoln's earlier designation of the Uintah Valley Reservation. *Ute I*, 521 F. Supp. at 1111. Specifically, the Act of May 5, 1864, authorized and required the Superintendent of Indian Affairs to bring together and settle in the Uintah Valley Reservation as many of the Indians of Utah Territory as might be found practicable and specifically set apart that area "for the permanent settlement and exclusive occupation of such of the different tribes of Indians of said territory as may be induced to inhabit the same." EXHIBIT 34 § 2. This language stands in stark contrast to the 1880 Act's direction that members of the Uncompahgre Band take title to lands as "[a]llotments in severalty" and sole title to the remaining lands be "released and conveyed to the United States." EXHIBIT 4 § 1 at 200, § 3 at 203.

Indeed, the Tribe itself has advocated for this interpretation of the 1880 Act, and the Tribe's own past judicial admissions on this point constitute strong evidence against its current interpretation. *See Shell Oil Co. v. United States*, 130 Fed. Cl. 8, 76 (2017) (noting that "judicial admissions in one case may be evidentiary admissions in another case," which "the factfinder is

free to weigh . . . against the other evidence adduced at trial.") (internal quotation marks and brackets omitted). Throughout the course of the *Ute* line of cases, the Tribe repeatedly asserted that that it did not "have compensable title to [the Public Domain Lands]" as part of its argument that the original Uncompahgre Reservation, nevertheless, survived the reservation's opening in 1897. EXHIBIT 1 at UTEDIS0425127, UTEDIS0425145-45; EXHIBIT 2 at UTEDIS0424940. And a majority of the Tenth Circuit's judges, sitting en banc, agreed with the Tribe's interpretation, explaining the "since title and reservation status are not congruent concepts, the 1882 Executive Order in no way interfered with Congress' intent that the Uncompahgres hold no title to the land." *Ute III*, 773 F.2d at 1097 (Seymour, J., concurring). Having advocated for its prior interpretation of the 1880 Act in the *Ute* line of cases just a few decades ago, and having convinced the Tenth Circuit of the correctness of that position, it is disingenuous now for the Tribe to assert the exact opposite position in this litigation.

**B. Statements made in connection with later related Congressional actions confirm that the 1880 Act did not provide the Tribe with a compensable interest in the Public Domain Lands.**

The plain language of the 1880 Act itself—and the Tribe's prior interpretations of it—demonstrate that the Tribe's claim to a compensable interest in the Public Domain Lands is unsound. To the extent more is needed, statements made by congressional committees, in opinions issued by the Secretary of the Interior and the Justice Department, and in congressional debates in the years immediately following the 1880 Act's passage demonstrate a contemporaneous understanding that Congress did not transfer a compensable interest in the Public Domain Lands to the Tribe.

The first bills to open the original Uncompahgre Reservation were introduced in the House and the Senate in 1890 and sought to restore "two ranges of townships" to the public

domain. EXHIBIT 35 at UTEDIS0383932-33; EXHIBIT 36 at UTEDIS0383853. In their original form, both bills provided that "all moneys arising from the sales of this land shall belong to [the Uncompahgre Band]." *Id.* However, the Committee on Indian Affairs in each house ultimately reported the bills with amendments eliminating any payment to the Uncompahgre Band. EXHIBIT 37 at UTEDIS0383932-33; EXHIBIT 38 at UTEDIS0384630. The Senate version of the bill passed both houses in June 1890, but was vetoed by President Benjamin Harrison. EXHIBIT 39 at UTEDIS0384691. In vetoing the bill, the President recognized the Uncompahgre Tribe only held the lands within the reservation "by an Executive order, with a contract right to take allotments upon them," but believed that opening up the lands as proposed in the act would "excite the[ Tribe's] distrust and fears, and possibly . . . create serious trouble." *Id*. at UTEDIS0384692.

During the next Congress, each house again considered a bill to restore a few designated townships on the eastern edge of the original Uncompahgre Reservation to the public domain. EXHIBIT 40 at UTEDIS0384676; EXHIBIT 41 at UTEDIS0384599. In its report, the Senate Committee on Indian Affairs concluded that the Uncompahgre Band had "no right in this reservation except the right to an allotment of agricultural land, for which the United States must be paid, out of the tribal funds derived from the proceeds of the lands ceded by the Utes in Colorado." EXHIBIT 40 at UTEDIS0384676-77. In its report, the House Committee on Indian Affairs noted that the original Uncompahgre Reservation "was set apart by Executive order only for the purpose of making allotments to the Uncompahgre Utes." EXHIBIT 41 at UTEDIS0384599. Neither bill was enacted.

In 1893, Delegate Joseph Rawlins of the Utah Territory introduced H. R. 4511, which directed the Secretary of the Interior to make allotments of land to the Indians of the Uintah and

Uncompahgre Reservations and restore the remaining lands to the public domain. *See* EXHIBIT 42 at UTEDIS0383846. H.R. 4511 was referred to the House Committee on Indian Affairs, but also generated correspondence within the executive branch regarding the rights of the Ute tribes to the lands they occupied on their respective reservations. *See id.*, at UTEDIS0383852; *see also* EXHIBIT 43 at UTEDIS0367529-34.

In response to questions from the Secretary of the Interior, Assistant Attorney General ("***AAG***") John Hall wrote a letter comparing and contrasting the creation of the Uintah Valley and Uncompahgre reservations and concluding "the Uncompahgre Utes have no title to the lands they occupy; that they occupy these lands as a temporary reservation until such time as the president may require them by virtue of the agreement, and the act of 1880, to take their allotments within the limits of said reservation." EXHIBIT 43 at UTEDIS0367531. AAG Hall reiterated his views in a later letter dated February 16, 1894. *See* EXHIBIT 44 at UTEDIS0367547. Similarly, in March of that same year, Secretary of the Interior Hoke Smith informed the chairman of the House Committee on Indian Affairs that he could not support either H.R. 4511 or a substitute submitted by the Commissioner of Indian Affairs.[11] *See* EXHIBIT 46. Like AAG Hall, Secretary Smith drew a sharp distinction between the rights of the Uintah and Uncompahgre Utes to their respective reservations and agreed with AAG Hall that

---

[11] In response to a request for the Department of the Interior's views on H.R. 4511, the Acting Commissioner of Indian Affairs provided the Secretary of the Interior with a report on the bill expressing his view that "in light of the general allotment act [of 1887] th[e Uncompahgre Band] have some additional title which they possibly did not before have." EXHIBIT 45 at UTEDIS0387969. The letter also included a modified draft of H.R. 4511 providing for negotiations with the Indians of the Uintah and Uncompahgre Reservations for the allotment and opening of their reservations and directing proceeds from the sale of surplus lands to be placed in the Treasury to the credit of the Indians. *Id.*, at UTEDIS0387973-80.

the Tribe did not hold a compensable title in the original Uncompahgre Reservation. EXHIBIT 46 at UTEDIS0367541.

After considering H.R. 4511, the House Committee on Indian Affairs reported a substitute bill, H.R. 6557, in April 1894. *See* EXHIBIT 47. Quoting extensively from AAG Hall's and Secretary Smith's letters, the committee concluded that "[t]he Uncompahgre Indians have no title to any of the lands within the reservation, nothing more than the privilege of temporary occupancy." *Id.* at UTEDIS0384595. In keeping with this finding, H.R. 6557, established a commission to implement the allotment and opening of the original Uncompahgre Reservation consistent with the 1880 Act. *See* EXHIBIT 48. After allotment, H.R. 6557 provided that remaining lands in the original Uncompahgre Reservation were to "be restored to the public domain" and "immediately open to entry under the homestead and mineral laws of the United States." *Id*. §§ 1, 2. An identical bill adopting the reasoning of the House Committee on Indian Affairs was introduced in the Senate. *See* EXHIBIT 49. Ultimately, H.R. 6557 was incorporated into the 1894 Act. *See* EXHIBIT 50 at UTEDIS0418969-70; *see also* EXHIBIT 10.

When allotment failed to occur following passage of the 1894 Act, Congress again took up the issue of opening the original Uncompahgre Reservation "for public entry." EXHIBIT 51 at UTEDIS0419013 (introducing a joint resolution to open the unallotted lands within the Uncompahgre Reservation to public entry); *see also* EXHIBIT 52 at UTEDIS0384023-27 (discussing a proposed amendment to an Indian appropriations bill that would open the unallotted lands within the Uncompahgre Reservation to public entry). While these proposed actions generated debate, the debate focused on the disposal of lands within the original Uncompahgre Reservation containing gilsonite deposits; the few references to the Uncompahgre

Band simply noted that members of the band had no compensable title to land within the original Uncompahgre Reservation beyond agricultural allotments. *See*, *e.g.*, *id.*

When Congress finally took up what would later become the 1897 Act, debates again largely centered on the issue of how best to dispose of or administer the reservation lands containing deposits of gilsonite. *See, e.g.*, EXHIBIT 53 at UTEDIS0419101; EXHIBIT 54 at UTEDIS0419115-16; EXHIBIT 55 at UTEDIS0419091-95. Consistent with the earlier debates from 1890 onward, those who discussed the issue of the Tribe's alleged interest in the Uncompahgre Reservation either took the view that the Tribe had no ownership rights at all or, if it did have "some sort of title," such title was extinguished once allotment allocation was complete. *See* EXHIBIT 53 at UTEDIS0419104-05; EXHIBIT 54 at UTEDIS0419115-17; EXHIBIT 55 at UTEDIS0419091-95.

In sum, the 1880 Act provided individual members of the Uncompahgre Band with a right to allotments in severalty and placed sole title to any un-allotted lands in the hands of the United States. The 1880 Act did not convey a compensable property interest to the Tribe. This meaning is clear on the Act's face and is confirmed by both the Tribe's judicial admissions and by the contemporaneous congressional record. The Tribe's taking claim fails as matter of law.

## II. The Tribe's Takings Claim is Barred by 28 U.S.C. ⁋ 2501.

Even if the Tribe had a compensable property interest in the Public Domain Lands, its claim for a taking of that interest would be time-barred. 28 U.S.C. § 2501 limits this Court's jurisdiction over claims to those filed within six years after they first accrue. *See San Carlos Apache Tribe v. United States*, 639 F.3d 1346, 1350 (Fed. Cir.) (2011) (citing *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 134 (2008)). A plaintiff's claims accrue when the events which fix the government's alleged liability have occurred and "the plaintiff was or

should have been aware of their existence." *San Carlos Apache Tribe*, 639 F.3d at 1350 (Fed. (citation omitted). Accrual is governed by an objective "knew or should have known" standard: "a plaintiff does not have to possess actual knowledge of all the relevant facts in order for the cause of action to accrue." *Id.* (citations omitted). And the Tribe bears the burden to demonstrate that its claims are timely by a preponderance of the evidence. *See Fid. & Guar. Ins. Underwriters, Inc. v. United States*, 805 F.3d 1082, 1087 (Fed. Cir. 2015) (*citing Brandt v. United States*, 710 F.3d 1369, 1373 (Fed. Cir. 2013)).

Assuming for the sake of argument that the 1880 Act did convey a compensable interest in the Public Domain Lands to the Tribe (rather than a right to an allotment to individual members of a constituent band), the Tribe's takings claim still fails because any such interest was extinguished outside of the applicable statute of limitations period. Rather than requiring that the United States hold proceeds from the sale or exploitation of the Public Domain Lands for the benefit of the Tribe—a contention for which the Tribe provides neither statutory nor precedential support—the 1894 and 1897 Acts restored the un-allotted lands within the original Uncompahgre Reservation to the public domain and, in doing so, terminated any interest the Tribe may have had therein. In addition, the record is replete with evidence demonstrating that the Tribe was aware (or should have been aware) of the United States alleged taking of the Public Domain Lands no later than 1986. As a result, the Tribe's takings claim is barred by section 2501.[12]

[12] To the extent the Tribe's alleged interest was extinguished in 1894 or 1897, its takings claim is also barred by the Indian Claims Commission Act, which bars any pre-August 13, 1946 claims by Indian tribes against the United States not brought before the ICC by August 13, 1951. *See* ICCA § 12, 60 Stat. 1052; *Sioux Tribe v. United States*, 500 F.2d 458, 489 (Ct. Cl. 1974).

### A. The Tribe's takings claim fails because the government action allegedly giving rise to its claims occurred no later than 1948.

If, as the Tribe contends, it received "recognized title" to the Public Domain Lands by virtue of the 1880 Act, that interest was taken when Congress authorized allotment of the lands within the boundaries of the original Uncompahgre Reservation and declared that un-allotted land would be "restored to the public domain" and "open for location and entry under the land laws of the United States." *See* EXHIBIT 10 §§ 20-21 at 337; EXHIBIT 11 at 87. A direction to "[r]estore land to the public domain" has been widely recognized as an explicit reference to an end or total surrender of all tribal interest. *McGirt v. Oklahoma*, 140 S.Ct. 2452, 2462-63 (2020) (identifying that Congress' direction that "tribal lands shall be 'restored to the public domain' indicates the termination of tribal interests in land) (citations omitted); *Hagen v. Utah*, 510 U.S. 399, 412 (1994) (The public domain is government-owned land that is "'available for sale, entry, and settlement under the homestead laws, or other disposition under the general body of land laws.'")(citation omitted). That is what happened here.

The 1894 Act authorized allotment of the Uncompahgre Reservation and decreed that any un-allotted lands be "restored to the public domain and made subject to entry." EXHIBIT 10 §§ 20-21 at 337. When the Department of the Interior failed to complete the allotment process, Congress passed the 1897 Act. *See* EXHIBIT 11 at 87. That act directed (rather than authorized) the Secretary of the Interior to allot the lands within the boundaries of the Uncompahgre Reservation and, again, directed that all un-allotted land "be open for location and entry under all the land laws of the United States." EXHIBIT 11 at 87. The Act makes no mention of the Tribe holding or maintaining a compensable interest in the newly opened lands. Just the opposite; rather than conferring a benefit on the Tribe, the 1894 and 1897 Acts expressly ended tribal interest in the Public Domain Lands with language commonly used for that purpose.

The 1948 Act is no different. As discussed above, in the years preceding the 1948 Act, and in response to growing competition for grazing lands located within the boundaries of the former Uncompahgre reservation, the Secretary of the Interior issued the 1933 Order, temporarily withdrawing the vacant and un-entered lands within the original reservation boundaries pending further congressional action. EXHIBIT 13 at UTEDIS0387370. When Congress did act on the issue in 1948, it increased the size of the Uintah and Ouray Reservation by adding the Hill Creek Extension, but it also expressly revoked 1933 Order, returning the remaining portion of the withdrawn Uncompahgre Reservation to its pre-1933 status—that is, returning it to the public domain pursuant to the 1897 Act. EXHIBIT 17 § 2 at 77; *see also Hagen*, 510 U.S. at 412 (noting that executive branch has authority to order that land belonging to the United States' public domain be reserved from sale and set apart for specific uses but once the land is "'restored' to the public domain—i.e., once again opened to sale or settlement—their previous public use [is] extinguished").

The legislative history behind these acts bolsters this interpretation. As discussed in section I.B above, the committee reports and debates leading up to the passage of the 1894 and 1897 Acts display a near universal opinion that the Tribe held no interest in the Public Domain Lands at all or, if it did, such interest would be extinguished once allotment was complete. *See* Argument, section I.B, *supra*. In like manner, as part of the discussion leading up to the passage of the 1948 Act, AAG Peyton Ford noted in his letter to the Chairman of the House Committee on Public Lands that well over half of the lands to be added to the Uintah and Ouray Reservation had once been part of the original Uncompahgre Reservation but identified that, according to the Supreme Court, the Tribe "received no interest in lands so withdrawn by Executive order,"

EXHIBIT 56 at UTEDIS0384616 (citing *Confederated Bands*, 330 U.S. at 176). The letter also noted that the Tribe "ha[s] no title or right in any of these lands." *Id.*

Given their straightforward terms and the related legislative history, it is not reasonable to read either the 1894 Act or the 1897 Act as intending anything other than termination of the Tribes' alleged interest in the Public Domain Lands. Nor is it reasonable to read the 1948 Act as giving the Tribe anything more than an interest in the lands expressly described therein and returning the remainder to the public domain through its revocation of the 1933 Order.

**B. The Tribe knew (or should have known) that the United States had taken its alleged interests in the Public Domain Lands long before it filed this action.**

As set forth in detail above, the Tribe's takings claim dates back to the 1894 Act when the United States ordered that the lands within the original Uncompahgre Reservation be returned to the public domain. Since that time there have been numerous events over the past century that should have alerted the Tribe to the United States' alleged taking of the Public Domain Lands and, in fact, demonstrate the Tribe's awareness of this fact, including:

- the 1894 and 1897 Acts returning the un-allotted lands within original the Uncompahgre Reservation boundaries to the public domain, EXHIBIT 10 §§ 20-21 at 337 & EXHIBIT 11 at 87;

- a December 1934 letter from the Tribe to the Secretary of the Interior acknowledging "the old Uncompahgre Reservation was public domain" and that the Tribe "had no title to it," EXHIBIT 20 at UTEDIS0331683, Secretary Ickes' determination in August 1934 to restore portions of the Tribe's reservations outside of the boundaries of the original Uncompahgre Reservation, EXHIBIT 21 UTEDIS0336575, and Secretary Ickes January 12, 1935 response to the Tribe's December 1934 letter, EXHIBIT 22 at UTEDIS0330877;

- An act passed by Congress on June 28, 1938, 52 Stat. 1209, as amended by Act of July 15, 1941, 55 Stat. 593 specifically authorizing the United States Court of Claims to "hear, determine, and render final judgment on all legal and equitable claims of whatsoever nature which the Ute Indians . . . may have against the United States, including . . . claims arising . . . by reason of any lands *taken from them, without*

*compensation* . . . ." Confederated Bands of Ute Indians v. United States, 100 Ct. Cl. 413, 414-15 (1943) (quoting 55 Stat. 593) (emphasis added; alterations in original);[13]

- the Assistant Secretary of the Interior's denial of the Tribe's 1938 restoration request and his statement that "no tribal rights or equities to this area were established in the Uncompahgre by [the 1882 Executive Order] establishing the reservation," EXHIBIT 23 at UTEDIS0368118;

- a 1945 Ute General Council meeting where the Tribe's attorney stated, "the Ute Indians have no claim on the Uncompahgre Reservation" and following allotment "the balance of the land was then restored to the Public Domain and the Uncompahgre Reservation set up for this temporary purpose was abolished." EXHIBIT 58 at UTEDIS0372445;

- an April 3, 1946, letter from the Solicitor of the Department of the Interior to the Tribe's attorney explaining that "[w]ith the exception of lands allotted to some 83 individual Indians, the reservation was restored to the public domain by the act of June 7, 1897(30 Stat. 87)[; t]he Indian title was thus extinguished," EXHIBIT 57;

- The 1948 Act withdrawing the earlier 1933 order and returning the Public Domain Lands to the public domain. EXHIBIT 17 § 2 at 7;

- the 1951 Petition wherein the Tribe alleged, among other things, that the United States failed to provide the Tribe with a reservation or provide proceeds from those lands to the Tribe, EXHIBIT 26 ¶¶ 10–12;

- a written report from the Tribe's lawyer to the Tribe recommending the 1965 Settlement Agreement and discussing the merits of a claim for the value of the Public Domain Lands, EXHIBIT 33 at UTEDIS0387787; and

- Statements in 1986 amicus briefing filed by the United States in opposition to certiorari review of *Ute III* stating "the public lands within the original Uncompahgre Reservation are not held for the benefit of the Ute Tribe," EXHIBIT 59 at 21, and "[t]he Tribe has no remaining equitable interest in [the Public Domain Lands]," EXHIBIT 60, at 5.

---

[13] Congress passed a similar statutes in 1909 conferring jurisdiction "upon the Court of Claims . . . to hear, determine, and render final judgment, with right of appeal as in other cases, on the claims and rights of said Indians under [the 1880 Agreement], including . . . the value of all lands ceded by the said Indians which have been set apart and reserved from the public lands as public reservations or for other public uses under existing laws and proclamations of the President, as if disposed of under the public-land laws of the United States, as provided by said agreement, and the money due therefor." *Ute Indians v. United States*, 45 Ct. Cl. 440, 443 (1910) (quoting 35 Stats., 788-789) (alterations in original).

These documents demonstrate that the Tribe has long been on notice of any alleged taking that occurred as a result of the 1894, 1897 or 1948 Acts. Nevertheless, the above-cited examples are not the only medium through which the Tribe received notice of its potential claim. For decades, the BLM has consistently administered the Public Domain Lands, focusing on range management and mineral development.

Following passage of the 1948 Act, the BLM took over exclusive management of the Public Domain Lands and issued orders and regulations to implement the Taylor Grazing Act. Compl., ECF No. 1 ¶¶ 54-55. Under the Taylor Grazing Act, BLM issued leases and permits to livestock operators that specified the numbers and types of livestock allowed to graze in a certain area during a specific time of year. *See* EXHIBIT 61 at UTEDIS0401083; *see also* EXHIBIT 62 at UTEDIS0399505-07. And BLM's management of the Public Domain Lands included adjudication of livestock use in which BLM staff reserved a certain amount of grazing capacity for wildlife. *See* EXHIBIT 63 at UTEDIS0402940, 942. By the 1960s, multiple use management of the public lands had become the guiding framework for BLM, and Congress formerly endorsed these policies in the Classification and Multiple Use Act of 1964. *See* EXHIBIT 64 at UTEDIS0398995. Likewise, in 1984, BLM prepared an EIS for the proposed resource management plan for the "Book Cliffs Resource Area," encompassing an area in the Public Domain Lands east of the Green River that constituted much of the former Uncompahgre Reservation and its range lands. EXHIBIT 65 at UTEDIS0099758-59, 859-61.

The BLM's ubiquitous management of the Public Domain Lands since the passage of the 1948 Act was another source of notice to the Tribe that its alleged interest in the Public Domain Lands had taken. More than that, and stepping out of the abstract, the Tribe's own interactions with BLM concerning the Public Domain Lands also demonstrate the Tribe's knowledge of its

potential claim more than six years prior to the filing of this lawsuit. For example, BLM required the Tribe to obtain BLM permits and pay grazing fees for use of the Federal range within the exterior boundaries of the original Uncompahgre Reservation—a permit that would not have been necessary if the Tribe held a compensable interest in the Public Lands. *See, e.g.*, EXHIBIT 66 at UTEDIS0099291 (March 1975 BLM invoice for grazing fees incurred by the Tribe) EXHIBIT 67 at UTEDIS0099268-270 (March 1992 grazing permit issued by BLM to the Tribe); and EXHIBT 68 at UTEDIS0099276-277 (May 2001 resolution by the Tribe's Business Committee accepting BLM's offer to renew grazing permits). Because the Tribe's alleged interest in the Public Domain Lands did not survive the 1894, 1897, and 1948 Acts, the Tribe has been subject to the same rules and regulations as non-Indians with respect to the Public Domain Land, which required submitting to BLM's authority, complying with BLM permits, and paying range fees.[14]

Thus, if the Tribe previously held a compensable property interest in the Public Domain Lands, it did not hold a compensable title or interest in those lands within the applicable statutory limitations period. *See* ECF No. 40 (issue No. 2). Rather, the 1894, 1897, and 1948 Acts would have constituted the taking of any compensable interest in the Public Domain Lands that the Tribe may have previously held. And the record here clearly demonstrates that the Tribe was

---

[14] As early as 1935, the Ute Tribe was not charged fees for grazing privileges on the un-entered lands within the original reservation boundaries because of uncertainty around what land Congress would include in what became the Hill Creek Extension. *See* EXHIBIT 69 at UTEDIS0367720-21. But by 1944, the Tribe was only exempted from paying fees in Utah Grazing District No. 8, because the Tribe had received a ten-year permit that afforded grazing privileges in the district without fees; the Tribe was otherwise required to pay grazing fees on the Public Domain Lands, and the ten-year permit expired in 1953. *Id.* In 1962, the Bureau of Land Management determined that no law or agreement indicated that the Tribe should be afforded free grazing privileges on Public Domain Lands. *Id.*

aware (or should have been aware) of these facts long ago, certainly earlier than six years prior to the date it filed this action. The Tribe's takings claim is time-barred.

### III. The Tribe's Takings Claim is Barred by Claim Preclusion and the 1965 Settlement Agreement.

Even assuming the Tribe ever had a compensable property interest and that its takings claim is not otherwise time barred, the Court should enter summary judgment in the United States' favor because—with the benefit of fact discovery—the evidence demonstrates that the Tribe indisputably raised this same claim in the ICC Action, litigated the claim, and settled and released it. As a result, and based on the evidence before the Court, the Tribe's takings claim is barred by the doctrine of claim preclusion. More than that, and assuming the Tribe had not already had a full and fair opportunity to litigate this claim, the evidence shows that the Tribe was aware of a potential taking claim long before it filed the 1951 Petition and therefore waived and released that claim as part of the 1965 Settlement Agreement.[15]

#### A. The Tribe has already litigated and settled a claim for the United States alleged taking of the entirety of the original Uncompahgre Reservation.

"The general concept of claim preclusion is that when a final judgment is rendered on the merits, another action may not be maintained between the parties on the same 'claim,' and defenses that were raised or could have been raised in that action are extinguished." *Hallco Mfg.*

---

[15] As an alternative basis for its original motion to dismiss, the United States previously sought partial summary judgment on the takings claim based on the 1965 Settlement Agreement. *See* Mot. to Dismiss, ECF No. 15, at 23-24. In its order, the Court rejected that argument because the record then before the Court indicated that the Tribe's waiver of claims did not extend to a claim for a taking of the entirety of the original Uncompahgre Reservation. Order, ECF No. 27, at 30-31. However, for the reasons set forth herein, and with the benefit of a fully developed factual record, this Court should reconsider the United States' argument under RCFC 60, which this Court has discretion to do. *See, e.g.*, *Yuba Nat. Res., Inc. v. United States*, 904 F.2d 1577, 1583 (Fed. Cir. 1990) (stating that "[t]he decision whether to grant reconsideration lies largely within the discretion of the [trial] court").

*Co. v. Foster*, 256 F.3d 1290, 1294–95 (Fed. Cir. 2001) (citing Restatement (Second) of Judgments, §§ 18–19)). Under this doctrine, claims that were raised or could have been raised are barred if "(1) the parties are identical or in privity; (2) the first suit proceeded to a final judgment on the merits; and (3) the second claim is based on the same set of transactional facts as the first." *Ammex, Inc. v. United States*, 334 F.3d 1052, 1055 (Fed. Cir. 2003). If these elements are met, claim preclusion applies, even if a plaintiff intends to present new evidence, new grounds, or new theories that were not presented in the first action. *PCL Const. Servs., Inc. v. United States*, 84 Fed. Cl. 408, 422 (2008); *see also Sharp Kabushiki Kaisha v. Thinksharp, Inc.*, 448 F.3d 1368, 1370 (Fed. Cir. 2006) (stating that claim preclusion reaches not only those matters that were previously litigated and decided, it bars subsequent litigation over matters that were never litigated but that could have been advanced in the earlier suit). Importantly, a settlement agreement "constitutes a final judgment on the merits in a *res judicata* analysis." *Ford-Clifton v. Dep't of Veterans Affairs*, 661 F.3d 655, 660 (Fed. Cir. 2011).

Here, all the elements necessary for claim preclusion are met. First, there is privity between the parties—both the 1951 Petition and the current lawsuit clearly list the "Ute Indian Tribe of the Uintah and Ouray Reservation" as the sole plaintiff and the United States of America as the sole defendant. *Compare* EXHIBT 26 at 0922ADC00002298 *with* Compl., ECF No. 1 at 1. And in both cases the Uncompahgre Band, operating through the Tribe, has sought compensation from the United States based on its alleged interest in the Public Domain Lands. *Compare* EXHIBT 26 at UTEDIS0422460 *with* Compl., ECF No. 1 at 1.

Second, there was a valid final judgement on the merits in the ICC Action. The claims in the 1951 Petition ended with a consent judgment wherein the Tribe waived all claims related to an alleged taking and failure by the United States to provide them with a reservation in Utah. *See*

EXHIBIT 28. Specifically, in exchange for $300,000, the Tribe agreed to "entry of a final order" which "finally dispose[d] of all claims or demands which the [Tribe] has asserted or could have asserted against the [United States] in [the 1951 Petition] and [the Tribe] shall be barred from asserting all such claims in any further action." EXHIBIT 27 at UTEDIS0422867.

Third, the Tribe's current suit is based on the same set of transactional facts as the ICC Action. "[A] common set of transactional facts is to be identified pragmatically." *Jet, Inc. v. Sewage Aeration Sys*., 223 F.3d 1360, 1363 (Fed. Cir. 2000) (internal quotation marks omitted). Thus, "courts have defined 'transaction' in terms of a 'core of operative facts,' the 'same operative facts,' or the 'same nucleus of operative facts,' and 'based on the same, or nearly the same factual allegations.'" *Ammex, Inc. v. United States*, 334 F.3d 1052, 1056 (Fed. Cir. 2003) (citations omitted). "[R]egardless of shared forms of relief or theories of liability, two suits share the same operative facts when the facts that are relevant and material to *some* theory of liability are the same in each." *Lower Brule Sioux Tribe v. United States*, 102 Fed. Cl. 421, 424 (2011)).

Both the 1951 Petition and the Tribe's current complaint are based on the core of operative facts: that the 1880 Act resulted in the Tribe receiving a compensable interest in the Public Domain Lands and those lands have been taken by the United States' refusal to recognize that interest. For example, in the 1951 Petition, the Tribe asserted that "Defendant disposed of all lands in the Utah reservation for the Uncompahgre Utes … without just compensation to said Uncompahgre Utes, or compensation agreed to by them, or any compensation whatever." *See* EXHIBIT 26 ¶ 11. The language "all lands in the Utah reservation" indicates the ICC Action extended to all the lands within the boundaries of the original Uncompahgre Reservation, including the Public Domain Lands. Similarly, in its current complaint, the Tribe states that "[t]his action arises out of the United States'… Fifth Amendment taking of some of the Tribe's

surplus property within the Uncompahgre Reservation" and alleges that the United States "did not pay the Uncompahgre Band or the Ute Tribe for the unallotted surplus lands of the Uncompahgre Reservation that were disposed of after 1897." Compl. ECF No. 1 ¶¶ 2 and 35. Both suits assert the same claim based on the same alleged facts. The only difference is that one lawsuit was litigated and settled over 60 years ago.

The Tribe's arguments throughout the ICC Action further demonstrates the point. In response to a motion for a more definite statement, the Tribe explained that the Uncompahgre Reservation "was taken away from them except for the 12,500 acres of allotments." EXHIBIT 29 at UTEDIS0425374. In like manner, the Tribe's opposition to the United States' 1956 motion for summary judgment states that the Tribe is "suing for …just compensation for the taking of the Uncompahgre Executive Order Reservation in Utah…" and that "said reservation subsequently was sold and disposed of as public lands." EXHIBIT 30 at UTEDIS0422494-95.

At bottom, both this suit and the ICC Action are pragmatically the same. They both seek just compensation for the Public Domain Lands based on an allegation that the 1880 Act gave the Tribe a compensable interest in the same. For this reason, the Tribe's current suit is barred by claim preclusion.

**B. The Tribe waived and released its takings claim in the 1965 Settlement Agreement.**

Setting aside the doctrine of claim preclusion, the 1965 Settlement Agreement also serves as a bar to the Tribe's takings claim because the Tribe was aware that the United States had (under the Tribe's theory) potentially taken the Public Domain Lands. A settlement, for enforcement purposes, has the same attributes as a contract. *Gonzalez v. Dep't of Labor*, 609 F.3d 451, 457 (D.C. Cir. 2010). If the language of a settlement clearly bars future claims, the plain language governs. *King v. Dep't of the Navy*, 130 F.3d 1031, 1033 (Fed. Cir. 1997). Indeed,

it is axiomatic that binding settlement agreements, stipulations, and stipulated judgments are enforceable in subsequent actions to bar re-litigation of the compromised or resolved claims. *See, e.g., Peckham v. United States*, 61 Fed. Cl. 102, 109 (2004). Any exclusions from a waiver or release must be clear, explicit, and "manifest" in the agreement itself. *United States v. William Cramp & Sons Ship & Engine Bldg. Co.*, 206 U.S. 118, 128 (1907); *Merritt-Champman & Scott Corp. v. United States*, 458 F.2d 42, 44–45 (Ct. Cl. 1972) (en banc) (per curiam).

In exchange for $300,000, the Tribe, in the 1965 Settlement Agreement, "finally dispose[d] of all claims or demands which the [Tribe] has asserted or could have asserted against the [United States] in [the 1951 Petition] and [the Tribe] shall be barred from asserting all such claims in any further action." EXHIBIT 27 at UTEDIS0422867. This included claims asserted in the 1951 Petition that the United States "disposed of all lands in the Utah reservation for the Uncompahgre Utes . . . as set forth in paragraphs 9 and 10 hereof without just compensation," "fail[ed] or refus[ed] to provide an adequate reservation," "fail[ed] or refus[ed] to provide any reservation," and failed to "maint[ain] the Uncompahgre Reservation in Utah as a reservation for said Uncompahgre Utes." EXHIBIT 26 ¶¶ 10-12.

The Tribe seeks to avoid its wavier in this case by claiming its prior takings claim was only for a *partial* taking of the Public Domain Lands. *See* Surreply, ECF No. 23-1 at 6-7. But this point is irrelevant because, in the 1965 Settlement, the Tribe waived both the claims it actually asserted in the ICC Action and any claims it "*could have asserted.*" *See* EXHIBIT 27 at UTEDIS0422867 (emphasis added). And the evidence shows that the Tribe was aware of a potential claim that the United States had (under the Tribe's theory) taken all of the un-allotted land within the original Uncompahgre Reservation, even if the Tribe chose not to pursue the claim. As set forth above, the Tribe acknowledged this potential claim in responding to the

United States' motions for a more definite statement and motion for summary judgment. Indeed, the Tribe actively argued that the "Uncompahgre Utes …were moved to a barren and unproductive Executive Order Reservation in Utah, and said reservation subsequently was sold and disposed of as public lands." *See* EXHIBIT 30 at UTEDIS0422495. Moreover, the Tribe repeatedly stated that the reservation "was taken away from them," EXHIBIT 29 at UTEDIS0425374, and that United States had "failed even to retain such bare and unproductive lands (except for approximately 12,500 acres allotted to 83 Uncompahgre Utes) for the use and occupation of the Uncompahgre Utes," EXHIBIT 31 at UTEDIS0425356.

Furthermore, the Tribe understood that the 1897 Act "opened for location and entry under public land laws *all land* in the Uncompahgre Reservation except approximately 12,500 acres which had been allotted to 83 Indians." *See* EXHIBIT 30 at UTEDIS0422497 (emphasis added). And at the time of 1951 Petition and 1965 Settlement Agreement, the Tribe believed "the Uncompahgres were never given their own reservation" and understood that the "executive order reservation was abolished." EXHIBIT 32 at UTEDIS0401926. Indeed, the Tribe discussed the merits of a "claim for the value of a reservation in Utah" with its counsel prior to agreeing to the 1965 Settlement Agreement. *See* EXHIBIT 33 at UTEDIS0387787. The Tribe's counsel explained that such a claim would probably be unsuccessful because the Tribe did not have a compensable interest in reservation lands outside of Colorado and that the Uncompahgre Band had already received "all if not more than [what] was contemplated for them in the 1880 agreement." *Id*.

The evidence is clear: at the time of the ICC Action, the Tribe was aware—assuming the Tribe had a compensable property interest in the original Uncompahgre Reservation (it did not)—that the reservation was "sold and disposed of" and "taken away" by the United States.

The Tribe also knew that the 1897 Act opened for location and entry under public land laws all land in the original Uncompahgre Reservation except approximately 12,500 acres which had been allotted to 83 individual tribe members. Accordingly, the Tribe's takings claim in this case is barred by both claims preclusion and the 1965 Settlement Agreement.

## IV. If this Court determines the Tribe does have an Ongoing Compensable Interest in the Public Domain Lands, its Takings Claim Should Be Limited in both Time and Scope.

Finally, and to the extent this Court finds that (1) the 1880 Act did convey a compensable interest in the Public Domain Lands to the Tribe (that was not subsequently extinguished by the 1894, 1897, and 1948 Acts), and (2) the Tribe's takings claim is not barred by the claim preclusion and the 1965 Settlement Agreement the Tribe's taking claim would still need to be limited in two important respects.

First, the Tribe's takings claim would be limited in time to the United States' alleged alienation of property rights within the Public Domain Lands that occurred no earlier than six years prior to the date the Tribe filed this action (March 7, 2018). *See generally* Compl., ECF No. 1 and ¶ 84 therein. This is so because, as explained in section II., *supra*, section 2501 bars any claim brought in the Court of Federal not "filed within six years after such claim first accrues." 28 U.S.C. § 2501. As set forth in detail in section II.B, *supra*, the Tribe has been (or should have been) aware of the United States' alleged seizure of and use of the Public Domain Lands for decades prior to the date it filed this action.

Second, the Tribe's takings claim would also be limited in scope. Specifically, and again assuming that Tribe holds a compensable interest in the Public Domain Lands, that interest does not include an interest in "lands containing gilsonite, asphalt, elaterite, or other like substances." EXHIBIT 11 at 87. Rather, the 1897 Act expressly reserved "the title to all of the said lands . . .

to the United States." *Id.* The term "like substances" extends to other minerals, such as graphite, oil, iron, coal, and lead. *See Alabama Flake Graphite Co. v. United States*, 125 Ct. Cl. 635, 647 (1953) (finding that "[g]raphite is an important strategic mineral"); *Swayne v. Lone Acre Oil Co.*, 98 Tex. 597, 607, 86 S.W. 740, 742–43 (1905) ("Oil, before its extraction, is a mineral, and is a part of the land, and, in so far as the question under discussion is concerned, is to be considered like iron, coal, lead, or other solid mineral substances.")

Thus, the Tribe's takings claim—if allowed to go forward—should be limited to actions by the United States that occurred after March 7, 2012 and did not involve the lease, sale, or exploitation of minerals.

**CONCLUSION**

The background for this case is expansive, stretching back for more than a century. However, at bottom, the issues before the Court are not complicated, and the relevant statutes are not ambiguous. The 1880 Act provided for allotments in severalty to individual members of the Uncompahgre Band but did not create a compensable property interest for the Tribe. And although President Arthur later chose to establish the original Uncompahgre Reservation, the Tribe itself has explained that "[a]s occupants of [that] Executive Order reservation, the Uncompahgre Indians (like all Indians occupying executive Order Reservations) do not as a matter of law have compensable title to their lands." EXHIBIT 1 at UTEDIS0425145. If any ambiguity as to the Tribe's property interests did remain, that ambiguity, and any alleged tribal interest in the Public Domain Lands, was eliminated by passage of the 1894, 1897, and 1948 Acts, the repercussions of which the Tribe has been aware for decades. In addition—and again assuming the Tribe ever held a compensable property interest—the record demonstrates that the Tribe knew of the alleged taking of the Public Domain Lands prior to passage of the Indian

Claims Commission Act and that the Tribe brought a claim before the ICC based on that alleged taking, which was litigated, settled, and released as part of that action.

Although the Tribe characterizes the unavoidable result of these facts as harsh in light of the historical treatment of this country's indigenous people, it does not change the fact that granting this motion is the correct application of existing law to the undisputed facts. And the result is consistent with how the 1880 Act has been interpreted by congressional committees, heads of executive agencies, and members of the judiciary since the 1880 Act's enactment. To the extent the Tribe finds the results of this interpretation unjust, its remedy lies beyond the powers of this Court. *See Arizona v. Navajo Nation*, 143 S. Ct. 1804, 1814 (2023) ("Under the Constitution's separation of powers, Congress and the President may update the law to meet modern policy priorities and needs."). For these reasons, and the reasons set forth above, the United States is entitled to summary judgment on the Tribe's takings claim as a matter of law. This would also require summary judgment to be entered in favor of the United States on the Tribe's claims for an accounting in aid of judgment. The result is that final judgment should be entered in favor of the United States.

Respectfully submitted this 11th day of August 2023,

TODD KIM
Assistant Attorney General

/s/ Brigman L. Harman
BRIGMAN L. HARMAN
ASHLEY CARTER
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 616-4119
Brigman.Harman@usdoj.gov
Ashley.Carter@usdoj.gov

Of Counsel:

Christopher K. King
Attorney-Advisor
Office of the Solicitor-Indian Trust Litigation Office
Department of the Interior
1849 C Street, N.W. Washington, D.C. 20240
202-208-4409 (phone)
Christopher.King@sol.doi.gov